UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| vs. | ) | No.   14 CR 390-1 |
| | ) | Honorable Milton I. Shadur |
| KEVIN JOHNSON | ) | |
| | ) | |

**GOVERNMENT'S MOTION TO DETAIN
DEFENDANT JOHNSON PENDING TRIAL**

The UNITED STATES OF AMERICA, by its attorney, ZACHARY T. FARDON, United States Attorney for the Northern District of Illinois, submits the following motion, pursuant to Title 18, United States Code, Section 3142, to detain defendant pending trial.

**BACKGROUND**

On July 8, 2014, defendant Kevin Johnson, together with his co-defendant Tyler Lang, was charged by indictment with two counts of damaging an animal enterprise, in violation of Title 18, United States Code, Section 43.   R.1.   As set forth in the indictment, it is alleged that defendant, together with Lang, vandalized and damaged a mink farm located in the Northern District of Illinois.  *Id.*   The indictment alleges that defendant and Lang poured an acidic substance on farm vehicles, spray painted the farm's barn, and released over 2,000 mink from the farm property, all of which resulted in significant damage to the mink farm.   *Id.*

On July 29, 2014, both defendants appeared before this Court for arraignment, at which time both defendants entered a plea of not guilty.   R.18.   At that hearing, the government agreed to conditions of bond for defendant Lang, the details of which were explained to Lang by this Court.   R.20, 21.

At the time of the arraignment, defendant Johnson was in state custody and therefore, the issue of his bond was deferred until his scheduled release. Defendant is serving a 30 month sentence after pleading guilty to possession of burglary tools, a conviction which resulted from his possession of items described in more detail below. Defendant Johnson is scheduled to be released from state custody on October 16, 2014. In anticipation of that release, the government now files its motion to detain defendant, as he constitutes a danger to the community. Specifically, the factors set forth in Title 18, United States Code, Section 3142, namely, the weight of the evidence, the history and characteristics of the defendant, and the nature and seriousness of the danger, each favor detention.

## THE WEIGHT OF THE EVIDENCE

As stated above, defendant is charged with damaging an animal enterprise. The evidence supporting that charge is overwhelming. Specifically, and as set forth in the discovery materials that have been tendered to the defendant, on the night of August 13, 2013, a mink farm located in Morris, Illinois was vandalized. Over 2,000 mink were released from their cages. Prior to the vandalism, each cage was designated with a card that indicated from which breed the mink came. During the vandalism, the cards were removed from the cages and some were torn into pieces. The rest were apparently removed from the farm. The barn was spray painted with red paint and the words, "Liberation is Love." Two farm trucks were damaged after an acidic substance was poured over them. The cages and fences surrounding the property also were damaged, appearing to have been pulled up from the ground.

In an attempt to recoup some of the loss, the farmers, along with assistance from law enforcement, recovered approximately 1,600 of the mink. The remaining mink died or were never recovered. Even for the recovered mink, however, the farmers were harmed in that they

were unable to determine the original breed for re-sale. The damage to the mink, which was the sole livelihood of the farm, together with the physical damage to the vehicles, the barn, and the fence, devastated the farmers, resulting in a loss in excess of $125,000.

The next morning, August 14, 2013, defendant and Lang were pulled over by a police officer with the Woodford County Sheriff's Office. The area in which defendant and Lang were pulled over was approximately 90 miles from the mink farm that had been vandalized the night before. When stopped, the vehicle was approximately eight miles from a fox farm and was headed in its direction.

At the time of the traffic stop, Lang was driving the vehicle and defendant was seated in the passenger seat. However, both Lang and defendant informed the officer that defendant was the owner of the vehicle. The fact that defendant owned the vehicle was confirmed both by the registration paperwork found in the car, as well as database queries conducted by the government. Both Lang and defendant further informed the officer that they were from the Los Angeles area, which also was confirmed by database queries. Lang and defendant gave conflicting accounts as to where they had been and where they were going, but both claimed that they were on a road trip visiting various friends.

Ultimately, police officers conducted a full search of the vehicle and recovered the following items that connected Lang and defendant to the mink farm vandalism:

- A flash drive which contained two known and widely circulated publications amongst animal rights extremists. Agents reviewed the publications, which revealed that the authors of the publications advocated the release of minks and foxes from fur farms and also advocated vandalism of the farms. The publications set forth instructions on how to accomplish the release of the animals, including by suggesting the use of new bolt cutters for each act of vandalism, to turn off cellular telephones leading up to and during the act of vandalism, and to obtain police radio scanners to detect law enforcement presence in the area.

- The publications recovered from the vehicle also included lists of mink and fox farms throughout the country. Both the mink farm in Morris, Illinois, and the fox farm in the Central District of Illinois were included in the publications.

- Consistent with the publications, there were multiple cutting tools, bolt cutters, and smaller snips which appeared to be new that were recovered from the vehicle.

- Cell phones were recovered and analyzed. Analysis of that cell site information revealed that, consistent with the publications' directives, the cell phones were turned off in the days leading up to the mink farm vandalism.

- A radio frequency scanner was recovered. A search of the radio frequency scanner recovered from the vehicle determined that the radio had been set to detect radio frequencies used by law enforcement in both Morris, Illinois, and Woodford County, Illinois. According to online information about the radio scanner, the scanner does not automatically pick up radio traffic in the area. Rather, the scanner must be manually programmed to a particular area in order to receive the radio scans from that area.

- Items consistent with committing a vandalism also were recovered, including, but not limited to, rubber gloves, ski masks, ball caps, bolt cutters, and miscellaneous cutters.[1]

- Animal hair was observed in the vehicle and on items removed from the vehicle.

- One bottle labeled "aircraft paint remover."

A number of the items recovered from the car were sent to FBI labs for further analysis. Based on that analysis, it was determined that some of the animal hair recovered from the clothing and other items found in the car was mink fur. It also was determined that aircraft paint remover was likely the substance that was used to damage the farm vehicles.

This evidence, which is only some of the government's evidence, overwhelmingly links defendant to the alleged offense, a factor that weighs in favor of detention. This offense for which there is overwhelming evidence was devastating to the victims, leaving them in an

---

[1] These items formed the basis for the possession of burglary tools conviction, for which defendant is currently serving a 30 month sentence.

untenable financial situation. That being said, this is not the sort of crime for which the government ordinarily would seek detention. Indeed, the government did not seek detention for co-defendant Lang and instead agreed that Lang should be released with standard conditions of bond. Defendant Johnson is different, however, because of his criminal past; the troubling nature of his prior involvement with animal rights extremism; and additional items recovered from his vehicle that illustrate a real potential for dangerousness.

## HISTORY AND CHARACTERISTICS

Defendant's past history and characteristics illustrate a commitment to unlawful extremism and the advancement of his agenda through crime.[2] His past demonstrates an inability to abide by the law for any sustained period of time. And his past shows an escalating dangerousness, one that cannot be ignored by the government or this Court in determining whether he should be released pending trial in this case. The following sets forth a timeline of defendant's criminal past and summarizes some of the more troubling incidents in which he has been involved.[3]

In August 2006, according to victim witnesses, officers with the Santa Monica Police Department ("SMPD"), and their review of videotaped footage of the protests, defendant was seen at multiple demonstrations outside of the homes of executives working for a juice

---

[2] The government notes from the outset that it does not condemn defendant for possessing books, writing passages, or lawfully campaigning on behalf of his beliefs. Indeed, activists lawfully and effectively advance their goals, protest, and demonstrate all the time, without interference or prosecution by the government. Here, though, defendant's past history, coupled with the instant offense and items recovered from his car illustrate that defendant is not committed to lawful advocacy and protest. Instead, he is committed to an illegal campaign of extremism; a campaign that is accomplished through fear and violence.

[3] FBI Los Angeles engaged in a long-term investigation of defendant. Reports from that investigation document the events set forth herein. Those reports have been tendered to defendant in discovery and will be provided to the Court upon request. In addition, in most instances, the government obtained the underlying police and/or court documents for each incident. Those reports too have been tendered to defendant and will be provided to the Court upon request.

manufacturer.[4] During the demonstrations, defendant was aggressive, encroached on the executives' property, and used a bullhorn to scream threats at the executives and the executives' family members, including young children. Defendant was videotaped screaming, among other things, "If it doesn't stop now certain individuals unbeknownst to us will come back and fuck with your shit far worse. You don't want to fuck with us." He also said, "We have pictures of you, we've got your address, we've got your car license plate and we can do whatever the fuck we want. Don't think you can do anything against us." Defendant also chanted, "Ten minutes, no cops. There is no one here to help you. Fifteen minutes, no cops." A summary of the SMPD investigation into these demonstrations, which sets forth the victims' reaction to the threats and harassment, is provided to the Court as Government Exhibit A.[5]

In October 2006, a search warrant was obtained by SMPD to search defendant's bedroom. The search warrants were part of the investigation by SMPD into criminal stalking of individuals employed by companies conducting animal experimentation. During the search of defendant's bedroom, officers recovered printed out maps to the homes of the executives who were the targets of the demonstrations described above. In addition, officers recovered three fully manufactured improvised paint grenades or "paint bombs," a balaclava with the letters "ALF," and a handwritten list of several furriers in the Los Angeles area. The improvised paint grenades were consistent with those known to be manufactured and used by extremists against animal enterprise targets such as fur stores. The balaclava is consistent with the type of mask known to be worn by animal rights extremists during the commission of crimes perpetrated by

---

4  The juice manufacturer was a target of animal rights extremists because of their alleged testing of animals.

5  Because the exhibits reference victims and include personal identifying information, the government has not publicly filed the exhibits and instead will provide them to the Court and defendant under separate cover.

members of the Animal Liberation Front ("ALF"). Officers also recovered an article written by an animal rights activist, entitled "No Compromise." A copy of the article is provided to the Court as Government Exhibit B. The article encourages the use of home demonstrations to instill fear and terror. Certain portions of the article were underlined in ink. Those underlined portions included the following:

- The animal abuser is no longer able to keep work separate from his personal life creating a host of financial and psychological problems that demonstrate the efficacy of targeting the opposition at home.

- Animal-abusers will consider another line of work when they can't sleep without fear of reprisals from activists.

- Nervous anticipation and suspense are almost as effective as the action itself, so making him sweat is key to effectively striking at home.

- The mental invasion and psychological sabotage are long-lasting and incredibly effective.

On February 7, 2008, defendant was convicted of two counts of burglary after he was caught with numerous stolen items that he had been selling on EBay. Defendant was sentenced to serve a 16 month prison sentence, but served considerably less than that as illustrated by the fact that he engaged in criminal activity only four months later.

On June 12, 2008, four months after he pleaded guilty to burglary, according to police reports, various individuals staged a demonstration outside of a Washington DC pharmaceutical firm. According to agents in Los Angeles who reviewed the case file, the property was damaged. Police officers interviewed individuals after the demonstration and, according to the officers, it was reported to them that defendant smashed a window during the demonstration.

On April 16, 2009, defendant and a female were arrested for criminal stalking. An indictment was filed against defendant and the female, which set forth the allegations that defendant and the female, among others, had repeatedly protested outside the home of UCLA professors. During those protests, the protestors, including defendant, were heard threatening, "Where were the cops when the ALF hit?," "You cannot stop A-L-F," "This is the year that you finally got a rough payback but it wasn't nearly enough," and "What goes around comes around, burn the fucker to the ground." The indictment also sets forth information from a protest conducted outside the home of another UCLA researcher, during which defendant was alleged to have been present. During that protest, the threats lodged at the UCLA researcher included, "Eleven minutes no cops . . . that's a really long time, you know," and "we know where you sleep at night." A copy of the indictment is provided to the Court as Government Exhibit C.

On March 19, 2010, defendant pleaded guilty to the indictment. As a result, defendant was incarcerated from April 2009 until November 2010, at which time he was released on parole. Defendant remained on parole until December 9, 2011.

Only five months after his release from parole, in May 2012, defendant was arrested for both shoplifting (May 5, 2012) and inciting a riot (May 22, 2012). Only five months after those arrests, defendant was arrested again. This time, on October 20, 2012, defendant was arrested for attempting to burglarize a pharmacy. On November 9, 2012, defendant pleaded guilty to commercial burglary and was sentenced to 16 months' imprisonment. He was released in June 2013.

At the time of his October 2012 arrest, numerous items were seized from defendant's vehicle, including a laptop, hard drives, flash drives, and two cell phones. State and federal

search warrants were obtained to search the electronic media. The following items were found on the defendant's electronic media:

- A list of employees of a science research company with accompanying photographs and personal information, including colleges attended. One listing references one of the employee's children. A copy of this document is provided to the Court as Government Exhibit D.

- Articles on making Improvised Explosive Devices ("IED") and C4 (a type of plastic explosive), and how to make zip guns, which are improvised homemade firearms.[6] Agents who reviewed the contents of the computer observed numerous photographs of a type of gasoline filled device, as well as diagrams explaining how to build such a device. According to agents familiar with animal rights extremists, the incendiary devices are those that have been used by animal rights extremists in the past.

- Manuals and documents dealing with burglary, cyber security and computer hacking tools and techniques.

- A 2004 unclassified/law-enforcement sensitive document on tactics used by Eco-Terrorists to detect and thwart law enforcement operations.

- Internal documents authored by the Fur Commission USA to include Fur Farm Security Protocols.

Finally, in August 2013, only two months after his release for his second burglary conviction, defendant was arrested for his role in the instant offense.

In sum, defendant's history and characteristics, which includes repeated violations of the law, and most importantly, incidents involving threats of violence and damage to property, illustrate that he is a danger to the community.

### NATURE AND SERIOUSNESS OF THE DANGER

Finally, the nature and the seriousness of the danger warrant detention. As described above, the potential danger exhibited by defendant involves the threat of violence and harm

---

[6] Historically, incendiary devices have been used by animal rights extremists in attacking their individual or business targets.

against individuals, a danger that cannot be overstated. In addition to the escalating nature of that danger as exhibited by defendant's past conduct, items recovered from defendant's vehicle at the time of his arrest in this case further demonstrate the seriousness of the potential danger. The following is a summary of those items recovered from defendant's vehicle in August 2013:

- Five bottles of muriatic acid; two bottles of Clorox bleach; one container of hydrogen peroxide. These substances taken together are necessary components to build an incendiary device.

- Books entitled "Thinking Like a Terrorist," "Unconventional Warfare Devices and Techniques: Incendiaries," and "Shadowing and Surveillance." *See* Government Exhibit E, photocopies of the books recovered from defendant's vehicle.

- Handwritten notes recovered from defendant Johnson's pants pockets. Excerpts from the handwritten notes include: "According to the courts, I'm doing something deeply illegal. So many warrants I'm bored of ducking police vehicles. The devil told me that I'm fundamentally evil. I get my protein when I hunt and eat people. Sicker than a vivisector stuck with a diseased needle with a hundred and three fever, who falls to his knees bleeding. My only vegan recipes start with gasoline and diesel." *See* Government Exhibit F, photocopies of the handwritten notes recovered from defendant's pockets.

- Another handwritten diary entry criticizing those who do not take direct action on behalf of ALF. The following are excerpts: "Participation is indeed superior to support; spectatorship is in fact complacency; virtue is in the deed;" "How is it possible to believe in a movement that accepts, even admires, those who unapologetically bask in reward without risk and benefit without cast? Sacrifice, suffering, peril, hardship – these are reserved for the animals upon whose corpses the egos of the talkers are built. Should the relationship between imprisoned animals and the movement for their liberation not be the exact inverse? Should we not, with the animals in mind, demand sacrifice, suffering, peril, and hardship of ourselves? Should the corpses of the victims not sit upon us, upon our souls, every cage unemptied a duty failed, every death a weight on our shoulders, a pain in our hearts? This is the burden of action;" and "we should all feel the pull. Animals are waiting in cages. Take action."

These items, together with the fact that defendant's prior dangerous acts were escalating, warrant detention. Indeed, these items together with the past events show someone whose

danger was and is on the upswing – someone who was not deterred by criminal prosecution, but instead was emboldened – someone who uses fear and threats to accomplish his goals.

## CONCLUSION

For the reasons set forth above, the government moves to detain defendant Johnson pending trial as he poses a danger to the community.

                                                Respectfully submitted,

                                                ZACHARY T. FARDON
                                                United States Attorney

By:    /s/ Bethany K. Biesenthal
        BETHANY K. BIESENTHAL
        NANCY DEPODESTA
        Assistant United States Attorneys
        219 South Dearborn Street
        Chicago, Illinois 60604
        (312) 886-7629

\