**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| United States of America | ) | |
| | ) | |
| | ) | No. 14 CR 390 |
| v. | ) | |
| | ) | Hon. Milton I. Shadur |
| Kevin Johnson, Tyler Lang | ) | |
| | ) | |

**DEFENDANTS' MOTION TO DISMISS INDICTMENT
AND MEMORANDUM OF LAW IN SUPPORT**

Defendant **KEVIN JOHNSON** by his attorneys, **RACHEL MEEROPOL,**[1] **MICHAEL DEUTSCH,** and **LILLIAN McCARTIN**, jointly with Defendant **TYLER LANG,** by the Federal Defender Program and its attorney **GEOFFREY MEYER,** respectfully move this Court to dismiss the indictment against them on facial overbreadth, vagueness, and substantive due process grounds. Defendants have previously sought and received leave to file a memorandum of law in excess of the Local Rule 7.1 page limit. *See* Dkt. No. 60 (Order).[2]

Defendants Kevin Johnson and Tyler Lang move to dismiss the indictment against them based on the invalidity of the law under which they are charged: the Animal Enterprise Terrorism Act (AETA), 18 U.S.C. § 43 (2014). The AETA is facially overbroad because it criminalizes protected speech that causes an "animal enterprise" to lose profits or goodwill. It is facially void for vagueness because its terms are so broad as to criminalize practically every property crime that has an interstate component and is undertaken against a business, allowing

---

[1] Rachel Meeropol, having been admitted *pro hac vice*, designates Michael Deutsch as local counsel, as required by Local Rule 83.15.

[2] For the Court's convenience, the required table of contents and table of authorities are attached hereto as Exhibits A and B.

for (and resulting in) arbitrary and discriminatory enforcement against animal rights activists. Finally, the AETA violates substantive due process both on its face and as applied to Defendants' conduct, because it punishes as an act of "terrorism" non-violent theft of private property.

## History of the Act

The AETA was signed into law on November 26, 2006, and replaced the Animal Enterprise Protection Act of 1992 (AEPA). The legislative history makes clear that the AETA was passed in direct response to the activities of animal rights activists. *See e.g.*, Introduction of the Animal Enterprise Terrorism Act of 2005, 151 Cong. Rec, E2276-02 (Nov. 4, 2005) (statement of Hon. Thomas Petri) (discussing threats posed by "animal rights extremists"); Statements on Introduced Bills and Joint Resolutions, 152 Cong. Rec. S9254-01 (Sept. 8, 2006) (statement of Hon. James Inhofe) (discussing actions by "extremist activists, acting in the name of animal rights"); Animal Enterprise Terrorism Act, 152 Cong. Rec. H8590-01 (Nov. 13, 2006) (describing "extremist elements among the animal rights groups").

The AETA makes it a federal crime to:

(a) Travel[] in interstate or foreign commerce, or use[] or cause[] to be used the mail or any facility of interstate or foreign commerce--
   (1) for the purpose of damaging or interfering with the operations of an animal enterprise; and
   (2) in connection with such purpose--
      (A) intentionally damage[] or cause[] the loss of any real or personal property (including animals or records) used by an animal enterprise, or any real or personal property of a person or entity having a connection to, relationship with, or transactions with an animal enterprise;
      (B) intentionally place[] a person in reasonable fear of the death of, or serious bodily injury to that person, a member of the immediate family… of that person, or a spouse or intimate partner of that person by a course of conduct involving threats, acts of vandalism, property damage, criminal trespass, harassment, or intimidation; or
      (C) conspire[] or attempt[] to do so[.]

2

18 U.S.C. § 43(a). Under the earlier AEPA it had been a crime to "intentionally cause[] *physical disruption* to the functioning of an animal enterprise by intentionally stealing, damaging, or causing the loss of, any property (including animals or records) used by the animal enterprise, and thereby cause[] economic damage exceeding $10,000 to that enterprise, or conspire to do so." 18 U.S.C. § 43(a) (2002) (emphasis added). The narrower AEPA also required that the defendant have "the purpose of causing *physical disruption* to the functioning of an animal enterprise." *Id.* (emphasis added).

Defendants are charged under the property damage prong of the AETA (section (a)(2)(A)). This provision is unusual in comparison to other criminal statutes in its omission of a specific *actus reus*. There is no single category of conduct that constitutes animal enterprise terrorism. Instead, animal enterprise terrorism under section (a)(2)(A) of the AETA means *any* interstate act (including speech) that is done for a broadly-defined *purpose* (interfering with an animal enterprise), and has a broadly-defined *effect* (causing damage or loss to such enterprise). "Animal enterprise" is also defined incredibly broadly, as essentially any entity that uses animals or animal products in any way. 18 U.S.C. § 43(d)(1). Critically, the statute fails to define "damaging," "interfering," "damages," or "personal property."

Penalties under the AETA depend on the amount of "economic damage" and/or bodily injury that result from the substantive violation. *Id.* at § 43(b). Economic damage is broadly defined, as, *inter alia*, "the loss of profits, or increased costs, including losses and increased costs resulting from threats, acts or vandalism, property damage, trespass, harassment, or intimidation taken against a person or entity on account of that person's or entity's connection to, relationship with, or transactions with the animal enterprise," but "does not include any lawful economic

disruption (including a lawful boycott) that results from lawful public, governmental, or business reaction to the disclosure of information about an animal enterprise." *Id.* at § 43(d)(3).

The AETA also includes a First Amendment "rule of construction." Under that rule, the AETA shall not "be construed . . . to prohibit any expressive conduct (including peaceful picketing or other peaceful demonstration) protected from legal prohibition by the First Amendment to the Constitution." *Id.* at § 43(e)(1).

Uncertainty over the AETA's scope and breadth has left activists to guess as to whether some of their activity presents the risk of a federal terrorism charge. Does the AETA criminalize picketing activity if the picketing is effective enough to close down a fur store?[3] Has non-violent civil disobedience, like sitting down in front of the doors of a business, been transformed from the state crime of obstruction to a federal crime of terrorism when the civil disobedience is performed by animal rights activists? Does a raucous demonstration with a giant video screen showing primate experimentation outside an animal researcher's home violate the AETA?[4] Are undercover investigators who work with local prosecutors and wear hidden cameras now risking animal enterprise terrorism charges if their investigation focuses on a slaughterhouse?[5] On its face, the AETA covers all of this activity and much more.

Moreover, the history of the AETA's precursor statute corroborates its applicability to speech and expressive conduct, rendering activists' fears all the more reasonable. The AEPA

---

[3] *See* Seth Prince and Spencer Heinz, *Activists Look Beyond Fur Shop's Move*, THE OREGONIAN, November 30, 2006, at B2 (discussing such a debate between an animal enterprise owner and animal rights activists).

[4] *See* Doug Erickson, *Protecting Researchers or Chilling Free Speech? Opponents and Animal Rights Activists Say the Law Goes Too Far, but Advocates Say it Gives Needed Protection*, WIS. STATE J., November 26, 2006, at A1 (discussing the ambiguity on those two question).

[5] *See* Kim Severson, *Upton Sinclair, Now Playing on YouTube*, N.Y. TIMES, March 12, 2008, at F1 (stating undercover investigators at slaughterhouses risked prosecution under the AETA).

required the Attorney General and Secretary of Agriculture to conduct a joint study on "the extent and effects of domestic and international terrorism on enterprises using animals," no less than a year after enactment. Report to Congress on the Extent and Effects of Domestic and International Terrorism on Animal Enterprises at 1, Dept. of Justice (1993). According to the resulting study, the AEPA was passed not only in response to concern about "expanding use of violence" but also "disruptive expressions of extremism on behalf of animal rights." *Id.* Under this rubric, the study summarized the *one* attempted act of violence attributed to an animal rights activist within the United States during the entire period surveyed (dating back to 1977), along with numerous acts of property damage. *Id*. at 8-25. Also noted, though not summarized, were the existence of many demonstrations, sit-ins, and other protests. *Id*. at 15.

The Congressional Study explored changing philosophies within the animal welfare and animal rights movements, touching on mainstream law-abiding organizations' tacit support for, if not involvement in, underground acts of animal liberation and economic sabotage. *Id*. at 7. Included among the damages to animal enterprises the AEPA was meant to address were increased security costs, as well as the collateral effect of a change in public opinion leading to gradual and permanent loss of animal enterprise clientele. *Id*. at 22.

### History of Constitutional Challenges to the AETA

There have been two prior constitutional challenges to the AETA. *See United States v. Buddenberg,* No. 09-CR-00263, 2009 WL 3485937 (N.D. Cal. Oct. 28, 2009); *Blum v. Holder*, 744 F.3d 790 (1st Cir. 2014), *petition for cert. filed,* Aug. 4, 2014.

*Buddenberg* arose from the first AETA indictment, in which four animal rights activists were accused of violating the AETA's threats provision – intentionally placing a person in reasonable fear of death or serious bodily injury – by virtue of participating in a series of

5

demonstrations at the homes of university professors involved in biomedical research on animals. *Buddenberg*, 2009 U.S. Dist. LEXIS 100477 at *1. The defendants moved to dismiss the indictment, contending that the AETA was facially unconstitutional on overbreadth and vagueness grounds, among other arguments. *Id.* Because the defendants were charged under the AETA's threats provision, 18 USC § 43(a)(2)(B), the Court held that they lacked standing to challenge the AETA's property damage provision, section 43(a)(2)(A). *Id.* at *4. The Court went on to hold that the threats provision was not overbroad or unconstitutionally vague. *Id.* at *5, *5-9. The Court's vagueness holding focused only on the imprecise nature of certain terms, and not on the AETA's susceptibility to discriminatory enforcement. *Id.* at *5-9. The Court did not consider the potential overbreadth of section (a)(2)(A), and the *Buddenberg* defendants did not present a substantive due process challenge. The *Buddenberg* indictment was ultimately dismissed for lack of specificity. *United States v. Buddenberg*, No. 09-CR-00263, 2010 WL 2735547, *10 (N.D. Cal. July 12, 2010).

*Blum* was a civil pre-enforcement challenge to the AETA, filed by five animal rights activists chilled from engaging in First Amendment protected advocacy out of fear of an AETA prosecution. 744 F.3d at 792-93. The First Circuit dismissed their case, holding they lacked standing to challenge the AETA as facially overbroad and vague because they failed to establish injury-in-fact. *Id.* at 792. The Court did not address the merits of the plaintiffs' constitutional claims, nor did it answer the question of whether section (a)(2)(A) prohibits causing the loss of intangible property. *Id.* at 801. Instead, the court ruled that plaintiffs faced no credible threat of AETA enforcement because the advocacy they desired to undertake was protected by the First Amendment, and the AETA's rule of construction prohibits prosecutions brought against "any expressive conduct (including peaceful picketing or other peaceful demonstration) protected

from legal prohibition by the First Amendment." *Id.* A petition for certiorari is currently pending before the Supreme Court.

**Argument**

**I.     Johnson and Lang Have Standing to Bring a Facial Challenge to the AETA**

Defendants Johnson and Lang challenge the legitimacy of the AETA on its face, irrespective of whether it may legally be used against them.[6] Facial challenges of this nature have a long pedigree where criminal statutes infringe on freedom of speech and association. *See, e.g.*, *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1926). This exception to the general prohibition on third-party standing allows facial challenges to statutes based on a "judicial prediction or assumption that [a challenged] statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression." *Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973), *see also United States v. Stevens*, 559 U.S. 460, 474 (2010).

The Seventh Circuit routinely hears facial challenges on overbreadth and vagueness grounds, *see, e.g., Ctr. for Individual Freedom v. Madigan*, 697 F.3d 464, 473 (7th Cir. 2012), including overbreadth and vagueness challenges by criminal defendants to the statutes they are prosecuted under. *See, e.g., United States v. Mire*, 725 F.3d 665, 672-74 (7th Cir. 2013); *United States v. Johnson*, 376 F.3d 689, 694-96 (7th Cir. 2004).

**II.    The AETA is Substantially Overbroad**

The overbreadth doctrine protects individuals who "may well refrain from exercising their rights for fear of criminal sanctions provided by a statute susceptible of application to protected expression." *Gooding v. Wilson*, 405 U.S. 518, 521 (1972). "[W]here conduct and not

---

[6] Johnson and Lang's substantive due process claim is both a facial and as-applied challenge to the statute.

merely speech is involved," overbreadth must be substantial to result in invalidity. *Broadrick v. Oklahoma*, 413 U.S. 601, 615 (1973). A facial challenge lies where there is a "realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court," *City Council v. Taxpayers for Vincent*, 466 U.S. 789, 801 (1984), a "substantial risk that application of the provision will lead to the suppression of speech," *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 580 (1998), or the "arguably impermissible applications of the statute amount to more than a tiny fraction of the materials within the statute's reach." *New York v. Ferber*, 458 U.S. 747, 773 (1982).

Thus, there are at least two ways for a party to demonstrate that a statute is substantially overbroad. First, as suggested by *Taxpayers for Vincent*, a court may focus on both the risk and the potential extent of the interference with First Amendment rights. 466 U.S. at 801. Second, as *Ferber* suggests, a court may focus on the number of instances in which the statute as applied will violate the First Amendment as compared to the amount of times it will regulate unprotected conduct. 458 U.S. at 773; *see also United States v. Williams* 553 U.S. 285, 303 (2008) (rejecting overbreadth challenge when statute is constitutional in the "vast majority of its applications"); *Ashcroft v. Free Speech Coal.,* 535 U.S. 234, 256 (2002) (finding law overbroad where it "covers materials beyond the categories" of child pornography and obscenity). Criminal statutes must be examined particularly carefully. *City of Houston v. Hill*, 482 U.S. 451, 459 (1987).

The first step in overbreadth analysis is to interpret the challenged statute. *United States v. Stevens*, 559 U.S. 460, 474 (2010). Courts do not defer to the Executive's own construction of criminal statutes. *Id*. at 480 ("We would not uphold an unconstitutional statute merely because the Government promised to use it responsibly."). A court may adopt a limiting construction to avoid difficult constitutional questions, but only if a statute is "readily susceptible" to it. *Reno v.*

*ACLU*, 521 U.S. 844, 884 (1997) (internal citation omitted). Otherwise Congress would have no incentive to narrowly craft legislation. *Stevens*, 559 U.S. at 481; *Osborne v. Ohio*, 495 U.S. 103, 121 (1990).

### A. The AETA's Generalized Prohibition on "Damaging or Causing the Loss of Any Real or Personal Property" is Overbroad

The AETA's prohibition on activity undertaken "for the purpose of damaging or interfering with the operations of an animal enterprise" by an individual who "intentionally damages or causes the loss of any real or personal property… used by an animal enterprise," is substantially overbroad. *See* 18 U.S.C. § 43(a)(1) & (a)(2)(A). These provisions criminalize loss of intangible property, such as money, that result from protected First Amendment activity.

#### i. Section (a)(2)(A) Criminalizes Causing the Loss of Intangible Property

The correct interpretation of a statute begins with the plain meaning of its terms. *See, e.g., Meghrig v. KFC Western, Inc*., 516 U.S. 479, 485-86 (1996) (interpreting "imminent" by beginning with dictionary definition); *Mississippi v. Louisiana*, 506 U.S. 73, 77-78 (1992) (beginning and ending with dictionary definition to resolve plain meaning of "exclusive").

The AETA outlaws damaging or causing the loss of "*any … personal property*" of an animal enterprise. Black's Law Dictionary defines "personal property" as "[a]ny moveable or *intangible* thing that is subject to ownership and not classified as real property." BLACK'S LAW DICTIONARY 1412 (10th ed. 2014). Money is intangible property. This means that the AETA prohibits causing an animal enterprise to lose profit or expend money on increased security.

There can be little doubt that Congress intended to include harm to intangible property within the scope of the AETA's prohibitions.[7] While the AETA's predecessor statute prohibited

---

[7] *See* 152 Cong. Rec. E2100-01 (Nov. 13, 2006) (statement of Hon. Steve Israel) ("This bill criminalizes conduct that 'intentionally damages or causes the loss of any real or personal

"physical disruption" to an animal enterprise, 18 U.S.C. § 43(a)(1992), the 2006 amendment

eliminated the "physical disruption" limitation, requiring only generalized "damage" to or

"interference" with an animal enterprise. If the AETA was not meant to encompass speech or

conduct which could impact the intangible property of an animal enterprise, it was strange for

Congress to amend the statute to eliminate the requirement of "physical" disruption. [8]

      In contrast, when Congress means to protect *only* tangible property, it does so clearly. In

over 30 different statutes, relating to both criminal and non-criminal areas of regulation,

Congress has specifically referred to "tangible personal property" rather than just personal

property.[9] And in defining a crime that threatens the "property of the United States," Congress

---

property,' however, the bill fails to define what 'real or personal property' means. As a result, legitimate advocacy - such as a boycott, protest, or mail campaign - that causes an animal enterprise to merely lose profits could be criminalized.")

[8] Indeed, even before this amendment, the Government had already showed a willingness to prosecute activity causing a loss of profits or increased security costs. In a 2007 AEPA prosecution of animal rights activists, the Government argued that AEPA prohibits such actions as placing repeated telephone calls to an animal enterprise with the goal of causing employees "to waste their time," and coordinated email "attacks" that prompted the purchase of firewall technology. *See* Consol. Br. for Appellee, *United States v. Fullmer*, No. 06-4211, 2008 U.S. 3d Cir. Briefs LEXIS 1334, at *27, 46 (3d Cir. June 17, 2008). Indeed, key to the Government's rebuttal of one of the points raised by the *Fullmer* defendants on appeal was that there was a logical and inextricable link between the term "economic damage" as used in the penalty provision and the element of causing damage or loss of property in the liability provision. *Id*. at *125 ("The penalty provisions for 'economic damage' and 'major economic damage' that are described in subsection (b) are themselves expressly linked to the damage or loss of property specified in subsection (a)."). The Third Circuit accepted the Government's reading, stating that "cyberattacks" against the animal enterprise caused a computer crash that resulted in $400,000 in lost business, $50,000 in staffing costs to repair the system, and $15,000 in new computer equipment, *United States v. Fullmer*, 584 F.3d 132, 142 (3d Cir. 2009). The court later discussed these intangible losses with respect to the AEPA's "loss of property" requirement. *Id*. at 159.

[9] *See, e.g.*, 4 U.S.C. § 107(a) (2013)(relating to taxation of property sold by United States); 7 U.S.C. § 941(c) (2013)(relating to taxation of Rural Telephone Bank); 7 U.S.C. § 3318(d) (2013)(relating to grants by Department of Agriculture); 11 U.S.C. § 541(b)(8) (2013)(relating to property in bankruptcy); 11 U.S.C. § 722 (2013)(relating to bankruptcy redemption); 12 U.S.C. § 1464(c)(2)(C) (2013) (relating to activity of federal savings associations); 12 U.S.C. § 1768

included "money" as one form of "property," clearly indicating that in its most general usage,

property includes intangibles. *See* 18 U.S.C.A. § 2114(a) (2013). In short, when Congress

intends to limit a protection of property to tangible property, it knows how to do so.

Precedent reinforces this conclusion. The Seventh Circuit recently confirmed that "'the

tangible/intangible characterization of property interests . . . is a distinction without a difference'

and 'is not generally recognized in international, federal, or state law.'" *Abelesz v. Magyar*

*Nemzeti Bank*, 692 F.3d 661, 673 (7th Cir. 2012) (alteration in original) (quoting *Nemariam v.*

---

(2013) (taxation of federal credit unions); 12 U.S.C. § 2290(a) (2013)(taxation of Federal
Financing Bank); 15 U.S.C. § 78kkk(e) (2013)(taxation of SIPC); 15 U.S.C. § 381(a)(1)
(2013)(property subject to income tax); 15 U.S.C. § 2301(1) (2013)(defining consumer product);
15 U.S.C. § 6611(a)(2) (2013)(relating to tort damages in Y2K actions); 18 U.S.C. § 1513(b)
(2013)(criminalizing causing damage or threatening damage to "tangible property of another
person" for the purpose of preventing testimony of a witness at an "official proceeding"); 19
U.S.C. § 81o(e) (2013)(relating to ad valorem taxation); 22 U.S.C. § 2697(d) (2013)(relating to
acceptance of gifts on behalf of the United States); 26 U.S.C. § 48(a)(5)(D) (2013)(relating to
energy tax credit); 26 U.S.C. § 48C(c)(2) (2013)(relating to energy project tax credit); 26 U.S.C.
§ 110(c)(3) (2013)(relating to construction allowances); 26 U.S.C. § 144(a)(12)(C)
(2013)(relating to tax exemption for qualified bonds); 26 U.S.C. § 168 (2013)(relating to
depreciation of property); 26 U.S.C. § 170(a)(3) (2013)(relating to charitable deductions); 26
U.S.C. § 199(c)(5) (2013)(relating to calculation of income); 26 U.S.C. § 263A(b)(1)
(2013)(relating to capitalization of certain expenses); 26 U.S.C. § 274(j)(3) (2013)(relating to
employee achievement awards); 26 U.S.C. § 408(m)(2)(F) (2013)(defining "collectible" for tax
purposes); 26 U.S.C. § 543(b) (2013)(relating to taxation of personal holding company income);
26 U.S.C. § 1298(d) (2013)(relating to special treatment of leased property); 26 U.S.C. §
1397C(d) (2013)(relating to definition of enterprise zone business); 26 U.S.C. § 2503(g)(2)
(2013)(relating to tax treatment of certain gifts); 26 U.S.C. § 2522(e) (2013)(same); 26 U.S.C. §
6323(b) (2013)(relating to property subject to tax liens); 26 U.S.C. § 6334(a)(13) (2013)(relating
to property subject to levying); 29 U.S.C. § 1302(g) (2013)(relating to taxation of Pension
Benefit Guaranty Corporation); 31 U.S.C. § 6306 (2013)(relating to authority of agencies to vest
title in certain property); 42 U.S.C. § 238(d) (2013)(relating to acceptance of gifts on behalf of
United States by Secretary of Health and Human Services); 42 U.S.C. § 4622(a)(2)
(2013)(describing losses eligible for payment when agency displaces business or farm
operation).

*Fed. Democratic Republic of Ethiopia*, 491 F.3d 470, 478 (D.C. Cir. 2007)). Other courts are in accord that a business's lost profits are easily characterized as damage or loss to property. [10]

> ii.  Criminalizing Loss to Intangible Property Without More Criminalizes Speech

With this principle established, and given the AETA's omission of an *actus reus*, the overbreadth of the statute is simply illustrated: it prohibits almost all effective advocacy by animal rights activists. For example, animal rights activists commonly seek to publicize the horrific treatment of animals at certain businesses and organize community campaigns in opposition to such treatment. Such businesses are certainly "animal enterprises." Publicizing and community organizing inevitably involves the use of a facility of interstate commerce; and activists have the intent of "damaging" or interfering with corporations' operations—the purpose of their advocacy is to cause businesses to suffer economically and be forced either to change their practices or to cease doing business entirely because of public outrage. 18 U.S.C. § 43(a), *see also Buddenberg,* 2009 WL 3485937 at *8 (noting that "[d]efendants are correct that a wide variety of expressive and non-expressive conduct might plausibly be undertaken with the purpose of interfering with an animal enterprise—a public protest, for example …).

---

[10] *Radiation Sterilizers, Inc. v. United States*, 867 F. Supp. 1465, 1470 (E.D. Wash. 1994), for example, involved the Price Anderson Act, which determines the law applicable to cases about "loss of, or damage to, or loss of use of property" caused by a nuclear incident. Plaintiffs included as such damage to property loss of profits, loss of customers, loss of goodwill, loss of access to operating cash and credit, loss of business opportunity and diversion of management time and resources. *Id.* at 1469. The court noted that some of this property is intangible, but held that it met the statutory provision anyway, as it has long been established in contract and tort law that a business's property includes intangibles such as profits and business goodwill. *Id.* at 1471. Similarly, *St. Paul Fire & Marine Ins. Co. v. N. Grain Co.*, 365 F.2d 361, 365-66 (8th Cir. 1966) involved interpretation of a insurance policy guarding against "injury to or destruction of property." The Eighth Circuit found that diminution in value of a wheat crop, due to substandard seeds, was fairly covered by the policy, despite the insurance company's argument that this harm to intangibles – profits, should not be considered injury to "property." *Id.* at 366-368.

If the targeted businesses suffer lost profits, or spend money in response to this organizing effort, the activists will thereby have "intentionally damage[ed] or cause[d] the loss of . . . personal property . . . used by an animal enterprise." 18 U.S.C. § 43(a)(2)(A). It is not hard to imagine this result. Animal enterprises may spend more money on security as a result of public demonstrations. Disgusted consumers may stop purchasing goods manufactured by animal enterprises. Some members of the public may be so enraged by what they learn from animal rights activists' campaigns that they respond by targeting a company for harassing and threatening conduct, be it legal or illegal.

For example, the recent documentary Blackfish levied sharp criticism at SeaWorld aquatic theme parks for their treatment of captive killer whales. The negative publicity from the film lead to the company losing $925 million in market capitalization and a subsequent securities class action for SeaWorld's failure to disclose potential liability related to the company's treatment of killer whales and the resultant negative publicity from the documentary.[11] The company also announced a multi-million dollar expansion of its orca tanks in response to the negative publicity generated by the film.[12] The film meets all of the requirements for an AETA violation. SeaWorld, which uses captive animals for entertainment, is undoubtedly an animal enterprise. The filmmakers' admitted "purpose" was to convince people to avoid patronizing

---

[11] *See, e.g.,* Eriq Gardner, *SeaWorld Hit With Lawsuit Over Failure to Advise on 'Blackfish' Impact*, THE HOLLYWOOD REPORTER, September 10, 2014, http://www.hollywoodreporter.com/thr-esq/seaworld-hit-lawsuit-failure-advise-731846.

[12] Tony Perry, *Amid 'Blackfish' backlash, SeaWorld to expand orca environments*, LA. TIMES, August 14, 2014, http://www.latimes.com/local/lanow/la-me-ln-seaworld-orca-plans-20140814-story.html.

SeaWorld's parks and ultimately affect their bottom line.[13] And the resultant damage caused SeaWorld more than a billion dollars in lost profits, loss of market capitalization, and money spent to construct its planned tank expansions. That the Government is unlikely to bring a controversial prosecution against documentary filmmakers does nothing to save the statute's overbreadth. *See Stevens*, 559 U.S. at 480 (explaining the dangers of "putting faith in Government representations of prosecutorial restraint.").

Because the AETA fails to include any *actus reus*, its overbreadth cannot be eliminated by use of a limiting construction. Adding an *actus reus* provision to the statute (for example, by interpreting the AETA to prohibit *using force or violence* to damage or cause the loss of any personal property) would be a "serious invasion of the legislative domain." *United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454, 479 n. 26 (1995). A court may not "rewrite a state law to conform it to constitutional requirements." *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 397 (1988).

### B. The AETA's Rules of Construction Do Not Save it from Unconstitutional Overbreadth

18 U.S.C. § 43(e)(1) directs that the AETA shall not be construed "to prohibit any expressive conduct (including peaceful picketing or other peaceful demonstration) protected from legal prohibition by the First Amendment." But Congress cannot shield an unconstitutional statute from scrutiny simply by adding a First Amendment exception that contradicts the broad sweep of its substantive provisions. *See, e.g., Waste Mgmt. Holdings, Inc. v. Gilmore*, 252 F.3d 316, 333 (4th Cir. 2001) (savings clause could not save regulatory statute from a constitutional

---

[13] *See* Austin Siegemund-Broka, *'Blackfish' Director Talks SeaWorld Revenue Drop: "People Are Truly Willing to Change Ethically"*, The Hollywood Reporter, August 20, 2014, http://www.hollywoodreporter.com/news/blackfish-director-talks-seaworld-revenue-726447.

challenge because it was "repugnant to the straightforward, limiting language of the respective statutory provisions" (citing *Looney v. Com.*, 133 S.E. 753, 755 (Va. 1926))); *Fisher v. King*, 232 F.3d 391, 395 (4th Cir. 2000) (savings clause is disregarded as void when it is inconsistent with the body of the statute); *CISPES (Comm. in Solidarity with the People of El Sal.) v. FBI*, 770 F.2d 468, 474 (5th Cir. 1985) (First Amendment savings clause "cannot substantively operate to save an otherwise invalid statute"); *State v. Machholz*, 574 N.W.2d 415, 421 n.4 (Minn. 1998) (same); *Long v. State*, 931 S.W.2d 285, 295 (Tex. Crim. App. 1996) (same).[14] If this were not so, the following law would be permissible: "[I]t shall be a crime to say anything in public unless the speech is protected by the first and fourteenth amendment." LAURENCE H. TRIBE, AMERICAN CONSTITUTIONAL LAW § 12-26, at 716 (1st ed. 1978).

Even if a well-drafted savings clause could operate to limit a statute's substantive reach, the AETA's broad First Amendment exception cannot dispel the plain sweep of the statute, because it fails to clarify what is protected under the First Amendment and what is not. This "trades overbreadth for vagueness" and "abandons scrutiny of the statute altogether for case-by-case adjudication." *State v. Moyle*, 705 P.2d 740, 748 n.12 (Or. 1985) (*en banc*). Lay persons cannot be presumed to understand what the First Amendment does and does not protect to the degree of certainty required for adequate notice in the criminal context. *See id.* ("An attempt to charge people with notice of First Amendment caselaw would undoubtedly serve to chill free expression"); *Long*, 931 S.W.2d at 295.

---

[14] Relatedly, in *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010), the Court considered a First Amendment savings clause similar to the AETA's as evidence of Congress' intent that its material support statute would not violate the First Amendment, *id.* at 36, but nonetheless analyzed the statute's substantive provisions and definitions to determine whether the Constitution was violated. *Id.* at 18-25.

Moreover, even taken at face value, the AETA's First Amendment exception covers only "expressive conduct," with no mention of other protected activity such as pure speech. 18 U.S.C § 43(e). This leaves to the potential criminal defendant the responsibility of determining what constitutes "expressive conduct," a question that has bedeviled Supreme Court Justices, let alone laypersons. *See generally* John Greenman, *On Communication*, 106 MICH. L. REV. 1337, 1339-40 (2008) ("The law nominally protects acts that are 'expressive,' but rarely defines that word"). *Compare United States v. O'Brien*, 391 U.S. 367, 376 (1968) (conduct cannot "be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea"), with *Spence v. Washington*, 418 U.S. 405, 409 (1974) (conduct is protected when it is "sufficiently imbued with elements of communication") and *Virginia v. Black*, 538 U.S. 343, 360-61 (2003) (referring to "symbolic expression" and "symbolic conduct" as protected in some circumstances).

The examples of "expressive conduct" provided in the Rules of Construction – "peaceful picketing or other peaceful demonstration" – further confuse the issue. For instance, some conduct is expressive and protected, even if it is not "peaceful." *See e.g., Brandenburg v. Ohio*, 395 U.S. 444, 446 n.1 (1969) (urging "revengeance" while others shouted "bury the [racial epithet]" is protected speech); *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 902 (1982) (threats by a civil rights leader that he would "break [the] damn neck" of anyone who frequented a "racist store[]" is protected). Other expressive conduct, like civil disobedience, is widely recognized as a peaceful form of demonstration, but is not protected by the First Amendment.

At base, the AETA's Rules of Construction require potential speakers to ignore the broad reach of the statute's substantive provision in favor of their own determination of what counts as expressive conduct and what kind of protest activity will be protected by the First Amendment.

Will an animal rights activist who desires to place a flier outside a fur store condemning the store as filled with "[expletive] murderers" who "should be run out of business" rest easy that her speech should be safe from prosecution as "expressive conduct" comparable to a "peaceful demonstration," when it is more accurately described as aggressive pure speech that is clearly intended to cause the store a loss of profit and goodwill? Reasonable people will steer clear of advocacy that might be protected but that also may be close to the First Amendment line. *NAACP v. Button*, 371 U.S. 415, 433 (1963).

### III. The AETA is Void for Vagueness

A statute is void for vagueness if it is susceptible to discriminatory or arbitrary enforcement by "impermissibly delegat[ing] to law enforcement the authority to arrest and prosecute on 'an ad hoc and subjective basis.'" *Bell v. Keating*, 697 F.3d 445, 462 (7th Cir. 2012) (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972)). Such "delegat[ion of] basic policy matters to policemen, judges, and juries" creates "the attendant dangers of arbitrary and discriminatory application." *Grayned*, 408 U.S. at 108-09. Laws must therefore provide explicit standards that do not "allow[] policemen, prosecutors, and juries to pursue their personal predilections." *Kolender v. Lawson*, 461 U.S. 352, 357-58 (1983) (citations omitted).

*Papachristou v. City of Jacksonville*, 405 U.S. 156 (1972), illustrates this concept. *Papachristou* involved a vagrancy ordinance that "set a net large enough to catch all possible offenders," leaving it to the courts to "say who could be rightfully detained, and who should be set at large." 405 U.S. at 165 (internal quotations omitted). This "convenient tool for harsh and discriminatory enforcement by local prosecuting officials, against particular groups deemed to merit their displeasure," tips the scales of justice such that "even-handed administration of the law is not possible," and thus "cannot be squared with our constitutional standards." *Id.* at 170,

171 (internal citations and quotations omitted). In line with this precedent, the Seventh Circuit

recently struck down as unconstitutionally vague Chicago's disorderly conduct statute, which

"empower[ed] law enforcement to order dispersal when faced with the likelihood of 'serious

inconvenience, annoyance or alarm.'" *Bell*, 697 F.3d at 463. The statute "'allow[ed] an

unrestricted delegation of power, which[,] "in practice leaves the definition of its terms to law

enforcement officers, and thereby invites arbitrary, discriminatory[,] and overzealous

enforcement."'" *Id*. (quoting *Leonardson v. City of East Lansing*, 896 F.2d 190, 198 (6th Cir.

1990) (quoting *Wash. Mobilization Comm. v. Cullinane*, 566 F.2d 107, 117 (D.C. Cir. 1977))).

The AETA sweeps just as broadly as any latter-day vagrancy law, federalizing a

tremendously broad range of conduct and thus providing law enforcement maximum discretion.

The AETA prohibits intentionally damaging or causing loss to an animal enterprise—or any

person or entity associated with an animal enterprise. 18 U.S.C. § 43 (a)(2). But "animal

enterprise" is defined incredibly broadly, and includes any "commercial or academic enterprise

that uses or sells animals or animal products for profit." 18 U.S.C. § 43 (d)(1)(a). This covers

every (non-vegan) grocery store, corner store, and restaurant in the country, along with most

clothing stores (so long as they carry leather, wool or silk). And the AETA does *not* require that

the defendant target an enterprise *because of* its connection to animals. The defendant need only

intend to damage or interfere with the enterprise, whether motivated by an animal rights ideology

or the desire to see glass shatter.

Applied evenhandedly, the AETA would federalize every act of theft, libel, or vandalism

against every food or retail store in the country, so long as there is an interstate component. As a

result, the AETA is exactly like the statutes invalidated in *Papachristou* and *City of Houston v.*

*Hill*, 482 U.S. 451 (1987): "The ordinance's plain language is admittedly violated scores of times

daily . . . yet only some individuals— those chosen by the police in their unguided discretion— are arrested." *Hill*, 482 U.S. at 466-67.

The AETA is not only susceptible to discriminatory enforcement, it is being enforced discriminatorily. Despite its incredibly broad reach, it is only individuals like Defendants, who are accused of releasing mink from cages, who are prosecuted under the AETA, while, for example, those who rampage through a farm bludgeoning nearly a thousand chickens to death with golf clubs are instead prosecuted by local county authorities without any interest from the federal government.[15] Indeed, the Government has baldly admitted that "only self-identified animal rights activists have been prosecuted under the AETA." Brief of Defendant United States, *Blum v. Holder*, No. 11-cv-12229 (D. Ma. Mar. 9, 2012) at 29.[16]

Because the AETA provides unbridled discretion to police and prosecutors and is susceptible to such blatantly discriminatory application it must be struck down as unconstitutionally vague. *See United States v. Lanning*, 723 F.3d 476, 483 (4th Cir. 2013) (striking down as unconstitutionally vague a federal disorderly conduct regulation that did not single out homosexual conduct for scrutiny but that presented "a real threat of anti-gay discrimination.")

## IV. The AETA's Punishment of Property Damage as a "Terrorist" Offense Violates Substantive Due Process on its Face and As Applied to Defendants' Alleged Conduct

As explained at length above, section (a)(2)(A) of the AETA prohibits causing loss or damage to an animal enterprise. The provision includes no requirement of ideological motive,

---

[15] *See* Jim Guy, *Riverdale man, three teens arrested in golf club bludgeoning of 900 Foster Farms chickens*, FRESNO BEE, October 2, 2014, *available at*: http://www.fresnobee.com/2014/10/02/4156464/riverdale-man-three-teens-arrested.html.

[16] This admission suggests a selective enforcement problem, *see generally United States v. Armstrong,* 517 U.S. 456 (1996), which may be the subject of a later motion.

violence, or the threat of violence. Yet, the AETA is a terrorism statute, passed "to provide the Department of Justice the necessary authority to apprehend, prosecute, and convict individuals committing animal enterprise *terror*." *Animal Enterprise Terrorism Act*, Pub. L.109-374, 120 STAT. 2652 (2006) (emphasis added). Because the prohibited conduct cannot rationally be punished as an act of terrorism, the AETA violates substantive due process both facially and as applied to Defendants' alleged conduct.

Substantive due process provides a "residual substantive limit on government action which prohibits arbitrary deprivations of liberty by Government." *Hayden v. Greensburg Cmty. Sch. Corp.*, 743 F.3d 569, 576 (7th Cir. 2014). Where no fundamental rights are involved, substantive due process claims require a showing that the "law bears no rational connection to a governmental interest or that it is so excessive in relation to a valid governmental purpose as to be punitive." *See Van Harken v. City of Chicago*, 906 F. Supp. 1182, 1195 (N.D. Ill. 1995), *citing Reno v. Flores*, 507 U.S. 292, 303-04 (1993).

The substantive due process interest at issue in this case – the right not to have a misleading label attached to one's serious crime – is well-recognized, particularly in the analogous context of challenges by individuals subject to sex offender registry requirements, whose underlying crime involved no sexual component. *See e.g., People v. Knox*, 903 N.E.2d 1149, 1151 (N.Y. 2010) ("the interest defendants assert is in not having their admittedly serious crimes mischaracterized in a way that is arguably even more stigmatizing, or more frightening to the community, than a correct designation would be. We do not hold this interest to be constitutionally insignificant"), *accord*, *State v. Robinson*, 873 So. 2d 1205 (Fla. 2004); *see also*, *Doe v. Mich. Dep't of State Police*, 490 F.3d 491, 500 (6th Cir. 2007) (recognizing substantive

due process interest in being free from being labeled a "*convicted* sex offender," when plaintiffs were never actually convicted of a sex offense).[17]

An individual who is successfully prosecuted under the AETA will be a "convicted terrorist." This labeling carries obvious and significant stigma and could potentially prejudice jurors; moreover, it has a real impact on conditions of incarceration. Among other possible repercussions, prisoners convicted of AETA violations are eligible for placement in the Bureau of Prison's "communications management units" – uniquely restrictive and segregated prison units designed in part for prisoners whose "current offense(s) of conviction, or offense conduct, included association, communication, or involvement, related to international or domestic terrorism." *Aref v. Holder,* 953 F. Supp. 2d 133, 137 (D.D.C. 2013).

This court must thus consider whether the AETA's prohibition on causing damage or loss to an animal enterprise (and Defendants' individual prosecutions for allegedly releasing animals from a fur farm) is rationally related to the purpose of the statute: to "apprehend, prosecute, and convict individuals committing animal enterprise *terror*."

There is no single unifying definition of terrorism in federal or international law. *See* Nicholas Perry, *The Numerous Federal Legal Definitions of Terrorism: The Problem of Two Many Grails*, 30 J. LEGIS. 249 (2004) (analyzing 22 definitions or descriptions of terrorism in

---

[17] Application of rational basis review in the sex offender registration context has led to mixed results, with some courts finding that mandatory sexual offender registration for non-sexual crimes is not rationally related to any legitimate legislative purpose, *see e.g., State v. Robinson*, 873 So. 2d 1205 (Fla. 2004); *ACLU of N.M. v. City of Albuquerque*, 137 P.3d 1215 (N.M. Ct. App. 2006); *State v. Reine*, 2003 WL 77174, 2003 Ohio 50, ¶23 (Ohio App. Jan. 10, 2003); and others holding that the legislature could rationally require sex offender registration for certain non-sexual crimes, such as kidnapping or false imprisonment of a minor, given that such a high percentage of these crimes are committed for a sexual purpose. *See e.g., Knox*, 903 N.E.2d at 1153-1154; *State v. Smith*, 780 N.W.2d 90 (Wis. 2010); *People v. Johnson*, 870 N.E.2d 415 (Ill. 2007); *Moffitt v. Commonwealth*, 360 S.W.3d 247, 256 (Ky. Ct. App. 2012); *People v. Phillip C.*, 847 N.E.2d 801 (Ill. App. Ct. 2006). Here, in contrast, there is no legitimate reason for punishing property loss directed at an animal enterprise as an act of terrorism.

federal law); Sudha Setty, *What's In a Name? How Nations Define Terrorism Ten Years After 9/11*, 33 U. PA. J. INT'L L. 1 (2011) (analyzing disparate international and federal definitions of terrorism). But there is "a consensus" that violence is a universal component of terrorism. *State v. Yocum*, 759 S.E.2d 182 (W. Va. 2014), Perry, 30 J. LEGIS. 249 at 251, *citing* ALEX P. SCHMID, POLITICAL TERRORISM: A RESEARCH GUIDE TO CONCEPTS, THEORIES, DATABASES AND LITERATURE 11 (1983) ("There is hardly a definition of terrorism that does not contain the word 'violence'") and WALTER LAQUEUR, THE NEW TERRORISM 6 (1999) ("perhaps the only characteristic generally agreed upon is that terrorism always involves violence or the threat of violence").

Federal law, with the *singular exception* of the AETA, mirrors this consensus.[18] Perhaps most tellingly, the federal terrorism sentencing enhancement allows for heightened penalties for all felonies that involve or are intended to promote "a federal crime of terrorism." 18 U.S.C Appx § 3A1.4. A "federal crime of terrorism" is defined an offense "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct" *that is also* a violation of certain enumerated federal laws, each of which involves violence or damage to key infrastructure. *See* 18 U.S.C. § 2332b. Animal Enterprise Terrorism is not a qualifying offense for the terrorism enhancement. *Id.* This means that under federal law the AETA both is and is not a crime of terrorism.

---

[18] *See, e.g.,* Foreign Intelligence Surveillance Act, 50 U.S.C. § 1801(c) (2000) (defining international terrorism as activities that "involve violent acts or acts dangerous to human life…" and "appear to be intended to intimidate or coerce a civilian population" or the Government); USA PATRIOT Act, 18 U.S.C. § 2331 (5) (West Supp. 2003) (defining domestic terrorism identically); 18 U.S.C. § 2332b (defining the crime of international terrorism to require violence or substantial risk of serious bodily injury); The Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135 (2002) (defining terrorism to require activity "dangerous to human life or potentially destructive of critical infrastructure or key resources").

Rational basis review is admittedly deferential – the Government need only show that the intrusion on liberty is "rationally related to a legitimate government interest." *Hayden v. Greensburg Cmty. Sch. Corp.,* 743 F.3d 569, 576 (7th Cir. 2014). But the Government cannot meet even this decidedly low standard because it is wholly arbitrary and irrational to punish the broad swath of activity covered by the AETA as terrorism. Causing damage or loss to real or personal property is not *terror*, because it is not inherently violent. Past AETA prosecutions demonstrate this disconnect, *see e.g., United States v. Viehl*, No. 09-CR-119, 2010 WL 148398, *1 (D. Utah Jan. 12, 2010) (AETA prosecution for releasing 500 mink and spray-painting slogans), *United States v. Demuth*, No. 09-CR-117 (S. D. Iowa Sep. 13, 2010), Dkt. No. 174 (plea agreement in AETA prosecution for releasing ferrets from private business), as do the current allegations against Defendants. *See* Govt's Mot. For Continued Detention, Dkt. No. 41, at 2 (alleging that Defendant Johnson released mink belonging to a private company, tore up cage labels, pulled down some fences, poured an acidic substance on two trucks, and spray-painted "Liberation is Love").

As one Ohio appellate court reasoned

[i]magine that the General Assembly, desiring to enable the public to protect itself from the risks represented by convicted felons living within their midst, were to enact a statute designating all persons convicted of felonies as "murderers," with registration and reporting requirements, so that neighbors would wind up being advised that John Jones, a "murderer," is now living on their block. John Jones is, in fact, a person who has been convicted of an esoteric election-law felony. It is the misnaming, or mis-characterization, of the offense, that is unreasonable and arbitrary.

*State v. Reine*, 2003 WL 77174, 2003 Ohio 50, ¶23 (Ohio App. Jan. 10, 2003). Terrorism is a word that "the average person can be expected to understand" as referring to something specific. *Id.* Labeling that "confounds this ordinary understanding of the words used," is unreasonable and arbitrary. *See id.* Indeed, true terrorism is "trivialized if the terminology is applied loosely in

situations that do not match our collective understanding of what constitutes a terrorist act."

*People v. Morales*, 20 N.Y.3d 240, 249 (2012).

## Conclusion

For the foregoing reasons, the Court must dismiss the indictment against Defendants Johnson and Lang on the ground that the AETA is unconstitutional on its face and cannot be applied to Defendants' alleged conduct consistent with due process of law.

Date:   November 6, 2014

Respectfully submitted,

*s/Rachel Meeropol*

Rachel Meeropol, *pro hac vice*
Center for Constitutional Rights
666 Broadway, 7th Floor
New York, NY 10012
(212) 614-6432

Michael Deutsch
Peoples Law Office
1180 N Milwaukee Ave
Chicago, Illinois 60642
(773) 235-0070

Lillian McCartin
2040 N. Milwaukee Ave. Ste. 13
Chicago, Illinois 60647
(773) 727-3799

*Attorneys for Kevin Johnson*

FEDERAL DEFENDER PROGRAM
 55 E. Monroe St., Suite
Chicago, Illinois 60603
(312) 621-8300

Carol A. Brook
Executive Director

By:      *s/ Geoffrey M. Meyer*
          Geoffrey M. Meyer

*Attorney for Tyler Lang*

# EXHIBIT A

# TABLE OF CONTENTS

History of the Act.................................................................................................................... 2

History of Constitutional Challenges to the AETA........................................................ 5

Argument ................................................................................................................................ 7

    I.     Johnson and Lang Have Standing to Bring a Facial Challenge to the AETA.....................7

    II.    The AETA is Substantially Overbroad................................................................7

       A.    The AETA's Generalized Prohibition on "Damaging or Causing the Loss of Any Real or Personal Property" is Overbroad.........................................................9

         i.    Section (a)(2)(A) Criminalizes Causing the Loss of Intangible Property.....................9

         ii.    Criminalizing Loss to Intangible Property Without More Criminalizes Speech .........12

       B.    The AETA's Rules of Construction Do Not Save it from Unconstitutional Overbreadth.........................................................................................14

    III.   The AETA is Void for Vagueness .....................................................................17

    IV.   The AETA's Punishment of Property Damage as a "Terrorist" Offense Violates Substantive Due Process on its Face and As Applied to Defendants' Alleged Conduct....19

Conclusion .........................................................................................................................24

# EXHIBIT B

# TABLE OF AUTHORITIES

## CASES

*Abelesz v. Magyar Nemzeti Bank*, 692 F.3d 661 (7th Cir. 2012)......................................................11

*ACLU of N.M. v. City of Albuquerque*, 137 P.3d 1215 (N.M. Ct. App. 2006)... ...........................21

*Aref v. Holder, 953 F. Supp. 2d 133 (D.D.C. 2013)* ..................................................................21

*Ashcroft v. Free Speech Coal.,* 535 U.S. 234 (2002) ...................................................................8

*Bell v. Keating*, 697 F.3d 445 (7th Cir. 2012) .........................................................................17, 18

*Blum v. Holder*, 744 F.3d 790 (1st Cir. 2014) .........................................................................5, 6

*Brandenburg v. Ohio*, 395 U.S. 444 (1969) ..............................................................................16

*Broadrick v. Oklahoma*, 413 U.S. 601 (1973)..........................................................................7, 8

*Ctr. for Individual Freedom v. Madigan*, 697 F.3d 464 (7th Cir. 2012)...........................................7

*City Council v. Taxpayers for Vincent*, 466 U.S. 789 (1984) .........................................................8

*City of Houston v. Hill,* 482 U.S. 451 (1987)...................................................................... 8, 18-19

*CISPES (Comm. in Solidarity with the People of El Sal.) v. FBI*,
770 F.2d 468 (5th Cir. 1985)................................................................................................15

*Connally v. Gen. Constr. Co.*, 269 U.S. 385 (1926)....................................................................7

*Doe v. Mich. Dep't of State Police*, 490 F.3d 491 (6th Cir. 2007)............................................. 20-21

*Fisher v. King*, 232 F.3d 391 (4th Cir. 2000) ..........................................................................15

*Gooding v. Wilson*, 405 U.S. 518 (1972) .................................................................................7

*Grayned v. City of Rockford*, 408 U.S. 104 (1972) ...................................................................17

*Hayden v. Greensburg Cmty. Sch. Corp.,* 743 F.3d 569 (7th Cir. 2014) ..................................20, 23

*Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010)............................................................15

*Kolender v. Lawson*, 461 U.S. 35 (1983) ................................................................................17

*Leonardson v. City of East Lansing*, 896 F.2d 190 (6th Cir. 1990)................................................18

i

*Long v. State*, 931 S.W.2d 285 (Tex. Crim. App. 1996)....................................................15

*Looney v. Com.*, 133 S.E. 753 (Va. 1926) ........................................................................15

*Meghrig v. KFC Western, Inc.*, 516 U.S. 479 (1996) .........................................................9

*Mississippi v. Louisiana*, 506 U.S. 73 (1992) ...................................................................9

*Moffitt v. Commonwealth*, 360 S.W.3d 247 (Ky. Ct. App. 2012)....................................21

*NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982).............................................16

*NAACP v. Button*, 371 U.S. 415 (1963) ..........................................................................17

*Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569 (1998).........................................8

*Nemariam v. Fed. Democratic Republic of Ethiopia,*
491 F.3d 470 (D.C. Cir. 2007)..................................................................................... 11-12

*New York v. Ferber*, 458 U.S. 747 (1982).........................................................................8

*Osborne v. Ohio*, 495 U.S. 103 (1990) .........................................................................8-9

*Papachristou v. City of Jacksonville*, 405 U.S. 156 (1972) .....................................17, 18

*People v. Johnson*, 870 N.E.2d 415 (Ill. 2007) ..............................................................21

*People v. Knox*, 903 N.E.2d 1149 (N.Y. 2010) ........................................................20, 21

*People v. Morales*, 20 N.Y.3d 240 (2012).................................................................23-24

*People v. Phillip C.,* 847 N.E.2d 801 (Ill. App. Ct. 2006) ..............................................21

*Radiation Sterilizers, Inc. v. United States,*
867 F. Supp. 1465 (E.D. Wash. 1994)..............................................................................12

*Reno v. ACLU*, 521 U.S. 844 (1997)............................................................................8-9

*Reno v. Flores*, 507 U.S. 292 (1993)...............................................................................20

*St. Paul Fire & Marine Ins. Co. v. N. Grain Co.*,
365 F.2d 361 (8th Cir. 1966)............................................................................................12

*Spence v. Washington*, 418 U.S. 405 (1974) ...................................................................16

*State v. Machholz*, 574 N.W.2d 415 (Minn. 1998).........................................................................15

*State v. Moyle*, 705 P.2d 740 (Or. 1985)....................................................................................15

*State v. Reine*, 2003 WL77174, 2003 Ohio 50 (Ohio App. Jan. 10, 2003) ............................21, 23

*State v. Robinson*, 873 So. 2d 1205 (Fla. 2004) .....................................................................20, 21

*State v. Smith*, 780 N.W.2d 90 (Wis. 2010)................................................................................21

*State v. Yocum*, 759 S.E.2d 182 (W. Va. 2014)...........................................................................22

*United States v. Armstrong,* 517 U.S. 456 (1996) .......................................................................19

*United States v. Buddenberg,* No. 09-CR-00263,
2009 WL 3485937 (N.D. Cal. Oct. 28, 2009).....................................................................5, 6, 12

*United States v. Buddenberg*, No. 09-CR-00263,
2010 WL 2735547 (N.D. Cal. July 12, 2010) ..............................................................................6

*United States v. Fullmer*, 584 F.3d 132 (3d Cir. 2009) ...............................................................10

*United States v. Johnson*, 376 F.3d 689 (7th Cir. 2004)................................................................7

*United States v. Lanning*, 723 F.3d 476 (4th Cir. 2013)...............................................................19

*United States v. Mire*, 725 F.3d 665 (7th Cir. 2013) .....................................................................7

*United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454 (1995)..............................................14

*United States v. O'Brien*, 391 U.S. 367 (1968)...........................................................................16

*United States v. Stevens*, 559 U.S. 460 (2010)...............................................................7, 8-9, 14

United States v. Viehl, No. 09-CR-119, 2010 WL 148398 (D. Utah Jan. 12, 2010) ....................23

*United States v. Williams* 553 U.S. 285 (2008).............................................................................8

*Van Harken v. City of Chicago*, 906 F. Supp. 1182 (N.D. Ill. 1995).............................................20

*Virginia v. Am. Booksellers Ass'n,* 484 U.S. 383 (1988)..............................................................14

*Virginia v. Black*, 538 U.S. 343 (2003) .....................................................................................16

*Wash. Mobilization Comm. v. Cullinane*, 566 F.2d 107 (D.C. Cir. 1977)......................................18

*Waste Mgmt. Holdings, Inc. v. Gilmore*, 252 F.3d 316 (4th Cir. 2001)...........................................14

## STATUTES

4 U.S.C. § 107 (2013) .........................................................................................10

7 U.S.C. § 941 (2013) .........................................................................................10

7 U.S.C. § 3318 (2013) .......................................................................................10

11 U.S.C. § 541 (2013) .......................................................................................10

11 U.S.C. § 722 (2013) .......................................................................................10

12 U.S.C. § 1464 (2013) .....................................................................................10

12 U.S.C. § 1768 (2013) .....................................................................................10

12 U.S.C. § 2290 (2013) .....................................................................................11

15 U.S.C. § 78kkk (2013) ...................................................................................11

15 U.S.C. § 381 (2013) .......................................................................................11

15 U.S.C. § 2301 (2013) .....................................................................................11

15 U.S.C. § 6611 (2013) .....................................................................................11

18 U.S.C. § 43 (1992) ...................................................................................2, 3, 4, 5

18 U.S.C. § 43 (2013) ................................................................................. *passim*

18 U.S.C. § 1513 (2013) .....................................................................................11

18 U.S.C. § 2114 (2013) .....................................................................................11

18 U.S.C. § 2331 (West Supp. 2003) .................................................................22

18 U.S.C. § 2332b (2013) ...................................................................................22

18 U.S.C. Appx § 3A1.4 .....................................................................................22

19 U.S.C. § 81o (2013) .......................................................................................11

22 U.S.C. § 2697 (2013) .....................................................................................11

26 U.S.C. § 48 (2013) ............................................................................................11

26 U.S.C. § 48C (2013) ..........................................................................................11

26 U.S.C. § 110 (2013) ..........................................................................................11

26 U.S.C. § 144 (2013) ..........................................................................................11

26 U.S.C. § 168 (2013) ..........................................................................................11

26 U.S.C. § 170 (2013) ..........................................................................................11

26 U.S.C. § 199 (2013) ..........................................................................................11

26 U.S.C. § 263A (2013) ........................................................................................11

26 U.S.C. § 274 (2013) ..........................................................................................11

26 U.S.C. § 408 (2013) ..........................................................................................11

26 U.S.C. § 543 (2013) ..........................................................................................11

26 U.S.C. § 1298 (2013) ........................................................................................11

26 U.S.C. § 1397C (2013) ......................................................................................11

26 U.S.C. § 2503 (2013) ........................................................................................11

26 U.S.C. § 2522 (2013) ........................................................................................11

26 U.S.C. § 6323 (2013) ........................................................................................11

26 U.S.C. § 6334 (2013) ........................................................................................11

29 U.S.C. § 1302 (2013) ........................................................................................11

31 U.S.C. § 6306 (2013) ........................................................................................11

42 U.S.C. § 238 (2013) ..........................................................................................11

42 U.S.C. § 4622 (2013) ........................................................................................11

50 U.S.C. § 1801 (2000) ........................................................................................22

*Animal Enterprise Terrorism Act*, Pub. L.109-374, 120 STAT. 2652 (2006)................................20

*The Homeland Security Act of 2002*, Pub. L. No. 107-296, 116 Stat. 2135 (2002).......................22

## OTHER AUTHORITIES

151 Cong. Rec, E2276 (Nov. 4, 2005)................................................................2

152 Cong. Rec. E2100 (Nov. 13, 2006)..............................................................9

152 Cong. Rec. S9254 (Sept. 8, 2006)...............................................................2

152 Cong. Rec. H8590 (Nov. 13, 2006) .............................................................2

BLACK'S LAW DICTIONARY (10th ed. 2014)........................................................9

Brief of Defendant United States, *Blum v. Holder*, No. 11-cv-12229 (D. Ma. Mar. 9, 2012) .......19

Consol. Br. for Appellee, *United States v. Fullmer*, No. 06-4211,
2008 U.S. 3d Cir. Briefs LEXIS 1334 (3d Cir. June 17, 2008) ....................................10

Doug Erickson, *Protecting Researchers or Chilling Free Speech? Opponents and Animal Rights Activists Say the Law Goes Too Far, but Advocates Say it Gives Needed Protection*, WIS. STATE J., November 26, 2006 ..................................................................................4

Eriq Gardner, *SeaWorld Hit With Lawsuit Over Failure to Advise on 'Blackfish' Impact*, THE HOLLYWOOD REPORTER, September 10, 2014 ........................................................13

Jim Guy, *Riverdale man, three teens arrested in golf club bludgeoning of 900 Foster Farms chickens*, FRESNO BEE, October 2, 2014 ................................................................19

John Greenman, *On Communication*, 106 MICH. L. REV. 1337 (2008)........................................16

WALTER LAQUEUR, THE NEW TERRORISM (1999) ........................................................22

Nicholas Perry, *The Numerous Federal Legal Definitions of Terrorism: The Problem of Two Many Grails*, 30 J. LEGIS. 249 (2004)..........................................................21, 22

Tony Perry, *Amid 'Blackfish' backlash, SeaWorld to expand orca environments*, LA. TIMES, August 14, 2014 ..................................................................................13

Seth Prince and Spencer Heinz, *Activists Look Beyond Fur Shop's Move*, THE OREGONIAN, November 30, 2006..................................................................................4

Report to Congress on the Extent and Effects of Domestic and International Terrorism on Animal Enterprises, Dept. of Justice (1993) ..........................................................5

ALEX P. SCHMID, POLITICAL TERRORISM: A RESEARCH GUIDE TO CONCEPTS, THEORIES, DATABASES AND LITERATURE (1983) ...............................................22

Sudha Setty, *What's In a Name? How Nations Define Terrorism Ten Years After 9/11*, 33 U. PA. J. INT'L L. 1 (2011) ...............................22

Kim Severson, *Upton Sinclair, Now Playing on YouTube*, N.Y. TIMES, March 12, 2008...............4

Austin Siegemund-Broka, *'Blackfish' Director Talks SeaWorld Revenue Drop: "People Are Truly Willing to Change Ethically"*, THE HOLLYWOOD REPORTER, August 20, 2014 ...........................14

LAURENCE H. TRIBE, AMERICAN CONSTITUTIONAL LAW (1st ed. 1978)........................................15

*United States v. Demuth*, No. 09-CR-117 (S. D. Iowa Sep. 13, 2010) ...........................................23

**CERTIFICATE OF SERVICE**

Rachel Meeropol, attorney for Defendant Kevin Johnson, hereby certifies that **Kevin Johnson and Tyler Lang's Motion to Dismiss Indictment and Memorandum of Law in Support** was served on all parties on November 6, 2014, in accordance with Fed.R.Crim.P. 49, Fed.R.Civ.P. 5, LR 5.5, and the General Order on Electronic Case Filing (ECF) pursuant to the district court's system as to ECF filers.

s/ Rachel Meeropol

Center for Constitutional Rights
666 Broadway, 7th floor
New York, NY 10012
(212) 614-6432