```
1                      IN THE UNITED STATES DISTRICT COURT
                         NORTHERN DISTRICT OF ILLINOIS
2                              EASTERN DIVISION

3
     UNITED STATES OF AMERICA,        ) Docket No. 14 CR 390
4                                     )
                         Plaintiff,   )
5                                     )
                 vs.                  )
6                                     )
     KEVIN JOHNSON AND TYLER LANG,    ) Chicago, Illinois
7                                     ) February 19, 2015
                         Defendants.) 10:00 o'clock a.m.
8

9            TRANSCRIPT OF PROCEEDINGS - ORAL ARGUMENT
                 BEFORE THE HONORABLE AMY J. ST. EVE
10

11   APPEARANCES:

12
     For the Plaintiff:          HON. ZACHARY T. FARDON
13                               United States Attorney
                                 BY:  MS. BETHANY K. BIESENTHAL
14                                    MR. WILLIAM RIDGWAY
                                 219 S. Dearborn St., Suite 500
15                               Chicago, Illinois  60604

16
     For Deft. Johnson:          PEOPLE'S LAW OFFICE
17                               BY:  MR. MICHAEL E. DEUTSCH
                                 2040 N. Milwaukee Ave., Suite 13
18                               Chicago, Illinois  60647

19                               MS. LILLIAN McCARTIN
                                 2040 North Milwaukee Avenue, Ste 13
20                               Chicago, Illinois  60647

21                               CENTER FOR CONSTITUTIONAL RIGHTS
                                 BY:  MR. RACHEL ANNE MEEROPOL
22                               666 Broadway, 7th Floor
                                 New York, New York  10012
23

24   For Deft. Lang:             FEDERAL DEFENDER PROGRAM
                                 BY:  MR. GEOFFREY M. MEYER
25                               55 East Monroe Street, Suite 2800
                                 Chicago, Illinois  60603
```

```
 1   APPEARANCES (Cont'd):

 2
     Also Present:              S/A MAUREEN MAZZALO, FBI
 3                              S/A ROBERT PARKER, FBI

 4
     Court Reporter:            MR. JOSEPH RICKHOFF
 5                              Official Court Reporter
                                219 S. Dearborn St., Suite 1232
 6                              Chicago, Illinois  60604
                                (312) 435-5562
 7
                     *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
 8
                            PROCEEDINGS RECORDED BY
 9                           MECHANICAL STENOGRAPHY
                         TRANSCRIPT PRODUCED BY COMPUTER
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

 1              THE CLERK:  14 CR 390, United States vs. Kevin

 2   Johnson and Tyler Lang.

 3              THE COURT:  Good morning.

 4         MS. BIESENTHAL:  Good morning, your Honor, Bethany

 5   Biesenthal and Bill Ridgway for the United States.

 6         MR. MEYER:  Good morning, Judge, Geoffrey Meyer from

 7   the Federal Defender Program on behalf of Mr. Lang.

 8         MR. DEUTSCH:  Good morning, Judge, Michael Deutsch

 9   and Lillian McCartin on behalf of Kevin Johnson, who is

10   present in open court.

11              I also want to introduce Rachel Meeropol, who is the

12   senior staff attorney for Center For Constitutional Rights.

13   And she'll be arguing on behalf of both defendants on the

14   motion.

15              THE COURT:  Good morning.

16         MS. MEEROPOL:  Good morning, your Honor.

17         MR. MEYER:  Judge, just so you're aware, Mr. Lang's

18   presence was waived today.  We originally had -- we were going

19   to ask the Court to allow him to phone in, but that's not

20   going to work with his work schedule.

21              THE COURT:  Okay.

22              So, he is choosing not to come for purposes of today?

23         MR. MEYER:  He is choosing not to come.

24              THE COURT:  Okay.

25              So, you are here for oral argument on the motion to

1     dismiss.

2            Ms. Merropol, you are going to argue on behalf of

3     both defendants; is that correct?

4            MS. MEEROPOL:  That's right, your Honor.

5            THE COURT:  Okay.

6            Are there any preliminaries, any issues you want to

7     address up front before we start?

8            MS. BIESENTHAL:  No.

9            THE COURT:  Ms. Biesenthal, are you arguing for the

10    government?

11           MS. BIESENTHAL:  I am.

12           THE COURT:  Okay.

13           MR. DEUTSCH:  Can we be seated?

14           THE COURT:  Everyone else may be seated, yes.

15           Whenever you are ready.

16           Ms. Biesenthal, you can sit if you want until it is

17    your turn, or you can stand.  Whatever your preference.

18           MS. BIESENTHAL:  I'll sit, Judge.  Thank you.

19           MS. MEEROPOL:  Thank you, your Honor.

20           Before I begin, I'd like to request the opportunity

21    for rebuttal.

22           THE COURT:  Certainly.

23           MS. MEEROPOL:  Thank you.

24           THE COURT:  Certainly.

25           I know you were not here at the status last week, but

1    I did not set time limits.  We will take whatever we need.

2            It would be helpful to address the issues in the

3    order that you presented them in your brief, if you would,

4    please.

5            MS. MEEROPOL:  Absolutely, your Honor.

6            This is a facial challenge of first impression to

7    Section (a)(2)(A) of the Animal Enterprise Terrorism Act, and

8    we have three constitutional claims.  First, that the law is

9    overbroad because it covers a substantial amount of protected

10   speech and advocacy --

11           THE COURT:  That one is not really a first

12   impression, is it, though, because didn't Blum -- and I know

13   you were on that case -- didn't Blum address that, although in

14   a different procedural context?

15           MS. MEEROPOL:  Well, Blum was a standing decision,

16   your Honor, and the Court did engage in some statutory

17   interpretation; but, the question before the Court was whether

18   the plaintiffs in that case had a credible fear of enforcement

19   under the statute, which requires a certain amount of

20   statutory interpretation.

21           But the Blum court didn't actually interpret the

22   meaning of (a)(2)(A)'s provision.  Instead, the court relied

23   entirely on the savings clause.

24           For an overbreadth challenge, the proper first step

25   of the analysis is to interpret what the statute itself

1    covers.  And that requires the Court to initially look at the

2    operative provision itself, (a)(2)(A) of the Animal Enterprise

3    Terrorism Act, which prohibits damaging or causing the loss of

4    any real or personal property, including animals or records,

5    used by an animal enterprise.

6         Now, there's really no dispute in this case that the

7    plain language of any personal property includes intangible

8    property.  We cited the dictionary definition, various torts

9    and contracts cases that interpret property as including

10   intangible property, and also provided examples of the

11   instances in which Congress specifies tangible personal

12   property.

13        THE COURT:  And you are only challenging that

14   particular section, correct?

15        MS. MEEROPOL:  That's right.

16        THE COURT:  I know there was, in the response, a

17   standing challenge as to anything else.  But it seemed to me

18   it was clear you were only challenging that particular section

19   that your client has been charged with.

20        MS. MEEROPOL:  That's right.  (A)(2)(A) only.  Not

21   (a)(2)(B), which was, of course, the provision at issue in the

22   Buddenberg case.

23        So, given that there's no dispute that the plain

24   language meaning -- the plain dictionary meaning -- of "any

25   personal property" includes intangible property, the

1  government relies on three arguments to make their point that

2  the Court should read "any personal property" as actually

3  meaning only tangible property.

4          The first argument relies on the parenthetical

5  "including animals or records."  The problem with this

6  argument is that the government has failed to cite a single

7  case or any kind of a statutory interpretation in which a

8  parenthetical that includes the word -- that begins with the

9  word "including" can be used to restrict a broad statutory

10 term.  Parentheticals that begin with "including" can expand.

11 They can emphasize.  They cannot restrict the plain meaning of

12 statutory language.

13          THE COURT:  But they can also explain, can't they?

14          MS. MEEROPOL:  They can.  They can explain, your

15 Honor.  And --

16          THE COURT:  So, they do not necessarily expand it.

17          MS. MEEROPOL:  Right.  They can explain.  They can

18 emphasize.

19          And in this point, it's most likely -- I read the

20 statute -- that Congress wanted to emphasize here two types of

21 property that they were particularly concerned about, given

22 the nature of the Act:  Animals and records.  Perhaps it was

23 also important to include animals because that might not be

24 commonly understood as property.

25          But, your Honor, a parenthetical cannot be used to

1    restrict.  There is simply no precedent for use of a

2    parenthetical in that way, especially when the statutory

3    provision includes the word "any," which is as broad a

4    statutory term as Congress can use.  And when Congress uses

5    the term "any," the courts have interpreted it to have its

6    plain meaning -- anything that falls into that category.

7           The government also relies on the fact that the

8    provision states that the property is used by an animal

9    enterprise.  But animal enterprises use money and their

10   business reputation in the same way that they use tangible

11   property.  That word can't transform an incredibly expansive

12   statutory term -- "any personal property" -- into a limited

13   restriction on causing damage to tangible personal property.

14          The government's second argument is that the

15   interaction of the penalty provision and the substantive

16   provision transform the broad statutory language.  And here,

17   they're referring to the way in which the penalty provision

18   bases penalty on the amount of economic damages that occur.

19          But, you know, I think this is really based on --

20          THE COURT:  It is something a little bit different

21   than that, isn't it?  Isn't it that under statutory rules of

22   construction not that they base the penalties on economic

23   damage, but that they use the words specifically "economic

24   damage" when they mean economic damage and they use it in the

25   same statute, which is a little bit different than what you

1    are saying?

2         MS. MEEROPOL:  Yes, your Honor.  So, they do use the

3    word "economic damages."  But it's as a noun.  It's as a

4    measure of the damage that occurs when there's a substantive

5    violation.  The way the phrase "damage" is used in the

6    substantive provision is completely different.

7         And it's a very confusing proposition because of the

8    way that "damage" functions as both a noun and a verb.  And

9    many of these cases sort of, you know, conflate the two --

10   many of the contracts torts cases.  It's hard to parse them to

11   understand whether the court is analyzing economic damage that

12   has occurred as a result of a substantive violation or whether

13   the damage is itself the substantive violation.

14        But given that (a)(2)(A) includes not just the term

15   "damage," but "caused the loss of property" -- right? -- it's

16   two different ways in which a substantive violation can occur.

17   And "caused the loss of property" is logically read to connect

18   to causing the loss of intangible property, causing the loss

19   of money.

20        So, given that there's no parallel wording that the

21   Court could actually compare here -- and one could imagine the

22   statute being written differently, right?  One could imagine

23   that the statute prohibits causing economic damage to an

24   animal enterprise or causing damage to an animal enterprise.

25        If that were the case, then I think the government

1    would have a stronger argument.  But because the provision is

2    written so broadly and the operative term to interpret here is

3    really the "any personal property" term, not the "damage"

4    term, their argument cannot defeat the plain meaning of the

5    broad provision.

6         Finally, your Honor, in terms of the overbreadth

7    analysis, the government points to the rules of construction,

8    which state that the AETA should not be interpreted to

9    prohibit First Amendment protected activities, especially

10   expressive conduct like peaceful protesting and demonstration.

11        The most important point about this is to recognize

12   that the Court must interpret the statutory provision first.

13   Right?  This overbreadth analysis requires the Court to decide

14   whether that provision -- whether (a)(2)(A) -- does allow for

15   the punishment of First Amendment protected activity that

16   causes a business to lose profit.

17        THE COURT:  But can the Court really interpret that

18   without looking at the rules of construction?

19        MS. MEEROPOL:  Well --

20        THE COURT:  And what are you relying on to say that

21   the Court has to look at the statutory language itself

22   separate and apart from the rules of construction?  Because

23   that certainly does not seem like the congressional intent

24   here when you look at the underlying legislative history.

25        MS. MEEROPOL:  Well, what precedent tells us -- and

1   it's just these cases perhaps the most commonly cited on this

2   issue; Humanitarian Law Project also sort of provides an

3   example of how it works in practice -- is that certainly a

4   rule of construction can serve to illuminate congressional

5   intent not to violate the First Amendment.

6         So, if there are two competing valid interpretations

7   of a statute, the savings clause, congressional intent can

8   sort of push the Court to one way or the other.  But there has

9   to be two competing valid interpretations.  Otherwise, what

10   you have is a situation where one provision of the statute by

11   its terms prohibits protected conduct and another provision

12   says it doesn't.  And that's a contradiction in the terms of

13   the statute, which is not adequately protective of First

14   Amendment rights because individuals can't have to guess which

15   provision will be enforced.

16         If the Court doesn't first interpret what (a)(2)(A)

17   prohibits, then we're in a situation where that provision

18   could be completely invalid on its face, as we argue, and the

19   savings clause has actually saved an otherwise invalid statute

20   when it's quite clear all the precedent -- and the government

21   acknowledges this -- is that a savings clause cannot save a

22   statute that is otherwise invalid on its face.

23         THE COURT:  So, would you agree, then, that if the

24   statute itself is open to more than one interpretation, one of

25   them not violating the Constitution, that the savings clause

1    here would save it?

2         MS. MEEROPOL:  If it's legitimately open to more than

3    one interpretation, yes, your Honor.  That is the time in

4    which a savings clause would operate.

5         But this statute simply is not legitimately open to

6    more than one interpretation.  The two -- the only two --

7    arguments that the government has to defeat the plain meaning

8    of "any personal property," which they have not disputed, is

9    the parenthetical -- which has never been used; they don't

10   cite a single case where a parenthetical restricts -- and the

11   interaction with economic damages, which would rely on a

12   completely different sort of phrase, a different part of

13   speech even, to try to limit an otherwise very broad

14   provision.

15        THE COURT:  What role should the very clear directive

16   from the legislative history play in interpreting the statute

17   here?

18        MS. MEEROPOL:  Well, your Honor --

19        THE COURT:  Because I think even you would agree that

20   the legislative history has a very clear directive that this

21   does not apply to First Amendment activity.

22        MS. MEEROPOL:  The problem is, your Honor, if we can

23   just take congressional intent not to violate the First

24   Amendment as a means to interpret every statute not to do

25   that, then that is the end of overbreadth challenges.  That

1    means Congress can include in every statute, "We don't intend

2    to violate the First Amendment."  And I'm sure Congress didn't

3    intend to violate the First Amendment here.

4          THE COURT:  And I am not asking for something that

5    broad.  I am talking very particular about this statute here

6    and the Court's construing the statute here in light of the

7    legislative history here and the very clear intent of

8    Congress.

9          MS. MEEROPOL:  Well, your Honor, I think that clear

10   intent has to be balanced against the purpose of the

11   overbreadth doctrine in itself, and that's to protect the

12   First Amendment rights of not only criminal defendants, but

13   individuals who are not in front of the Court whose speech

14   will be chilled by an overly broad statute, regardless of

15   whether Congress intended that speech to be chilled or not.

16          You know, this is a situation where this law is known

17   about.  This law has an impact in the animal rights community

18   that is broader than just the parties before this Court.  And

19   whether or not Congress intended that impact, Congress has to

20   be incentivized to pass laws that are narrow and proper on

21   their terms, not simply saving them by indicating their intent

22   not to violate the First Amendment.

23          THE COURT:  Are you aware of any cases where the

24   savings clause specifically references the First Amendment or

25   some other constitutional provision or specific examples of

1    protected conduct like the one does here --

2              MS. MEEROPOL:  Uh-huh.

3              THE COURT:  -- where a court has gone on to say that

4    the statute is nonetheless unconstitutional with a very

5    specific savings clause like that?

6              I know you cited some cases in your brief, but none

7    of the savings clauses in those particular cases had a

8    specific reference to a specific constitutional provision or

9    specific conduct like the one does here.

10             MS. MEEROPOL:  Your Honor, I'm going to have to look

11   back at the briefing.  And I will do that after I sit down and

12   try to bring you -- I do have a case in mind, but the name is

13   escaping me at the moment.

14             But I do believe that one of the out-of-district

15   cases that involved restrictions on a parade permit actually

16   included -- and the name is just escaping me.

17             THE COURT:  Okay.  That is fine.

18             MS. MEEROPOL:  But I will bring it to you.

19             THE COURT:  That is fine.

20             MS. MEEROPOL:  But the law is clear, your Honor --

21   and the government acknowledges -- that if the provision -- if

22   the statute is facially invalid, if the statute as is fairly

23   read infringes on First Amendment protected activity, then the

24   savings clause cannot save the statute.  And the Humanitarian

25   Law Project, there was also a savings clause.  And the Supreme

1    Court acknowledged that, but it went on to interpret the

2    statutory provisions, not rely on that savings clause.

3            Unless the Court has other questions about the

4    overbreadth claim, I'll turn to our vagueness claim next.

5            THE COURT:  Go ahead and turn to the vagueness,

6    please.

7            MS. MEEROPOL:  Thank you.

8            So, of course, this is a claim that (a)(2)(A) of the

9    Animal Enterprise Terrorism Act is unconstitutionally vague

10   because it is so broad as to federalize almost any property

11   crime against almost any business.  And this invites, and, in

12   fact, has resulted in, arbitrary and discriminatory

13   enforcement.

14           THE COURT:  And your argument here, just so the

15   record is clear, does seem to be focused on the discriminatory

16   enforcement prong of the vagueness doctrine, not the other

17   one; is that fair?

18           MS. MEEROPOL:  Not the notice --

19           THE COURT:  Not the notice.

20           MS. MEEROPOL:  -- prong.

21           Yes, that's correct, your Honor.

22           And just as an example, you know, if an individual is

23   robbing a corner grocery store, right, and he's on a cell

24   phone with his friend who is standing outside serving as a

25   lookout, that is a violation of (a)(2)(A).  This type of crime

1   occurs every day hundreds of times across the country.  These

2   crimes, of course, would be very unlikely to be prosecuted as

3   Animal Enterprise Terrorism Act violations, and yet they fit

4   the statutory description.

5           Given that, that's the situation, just like

6   Papachristou, where the government has cast such a wide net

7   that they can pick and choose with unfettered discretion which

8   types of crimes to make federal crimes rather than allow them

9   to be punished under state law, where one would normally

10  expect that property crimes of that nature would be punished.

11          So, really, the government's argument here is that,

12  you know, we haven't identified particular vague terms.  But a

13  term can be so broad as to fail to cabin police and

14  prosecutorial discretion, just as it can be too vague to do

15  so.  The term "animal enterprise" here is so broad that it

16  allows for this law to be used incredibly expansively; and,

17  yet, of course, we see it used only against one group:  A

18  politically unpopular group, animal rights activists.

19          Moving on from the vagueness claim, your Honor --

20          THE COURT:  Before you go on, why doesn't the other

21  language in the statute that is more specific defeat your

22  vagueness argument?

23          Let's assume "animal enterprise" is broad.

24          MS. MEEROPOL:  Uh-huh.

25          THE COURT:  Why doesn't the other language --

1    "intentionally damaging or causing the loss," the more

2    specific language -- save the statute?

3              MS. MEEROPOL:  Well, I think that's --

4              THE COURT:  Because the cases you have relied on have

5    very broad kind of archaic terms.

6              MS. MEEROPOL:  They do, your Honor.  That's fair.

7              THE COURT:  Unlike this.

8              MS. MEEROPOL:  You know, I think what's incredibly

9    unusual about the Animal Enterprise Terrorism Act is that

10   there is no actus reus.  Right?  The law punishes action taken

11   for a particular purpose, and it's a very broad purpose:

12   Interfering with an animal enterprise or damaging it -- that

13   could be anything, really -- and, then, having a certain

14   effect.

15             But the law does not include what the actual conduct

16   at issue that is criminalized.  That means that any conduct or

17   speech can have the given effect and can be undertaken for the

18   particular purpose.

19             So, actually, (a)(2)(A) doesn't really cabin the

20   reach of the Animal Enterprise Terrorism Act at all.  It

21   broadens it.  And it's really the interaction of those two

22   provisions -- the lack of an actus reus, which is unusual in a

23   criminal law, and the fact that "animal enterprise" is defined

24   so incredibly broadly -- that gives rise to the

25   unconstitutional vagueness here, your Honor.

 1          THE COURT:  Okay.

 2          MS. MEEROPOL:  Now, the Court had asked us to

 3   address, with respect to the substantive due process claim,

 4   the question of why -- whether it's rational for the

 5   government to call this Act animal enterprise terrorism.  This

 6   requires a two-step analysis.  First we have to hypothesize

 7   the possible reasons that Congress named the Act "Animal

 8   Enterprise Terrorism" and then determine whether those reasons

 9   are rationally related to a legitimate government purpose.

10          So, I can imagine two reasons here.  The first and

11   the most obvious is that Congress may have named the Act

12   "Animal Enterprise Terrorism" if it describes conduct that can

13   fairly be characterized as terrorism.  But terrorism is about

14   violence or a threat of violence or a risk of danger to human

15   life.  There's no one federal definition of terrorism, but

16   there is a consensus among all of the federal definitions, and

17   international law, as well, that terrorism includes as

18   elements violence, threat of violence, as well as the

19   motivation of coercing government cooperation or civilian

20   cooperation.

21          None of those elements appear in (a)(2)(A).  It's a

22   provision that is quite clearly about causing loss of

23   property.  There -- and if we look at sort of the history of

24   enforcement of that provision, it has primarily been enforced

25   against individuals like these defendants who are accused of

1   releasing animals.  There's no reason to expect that, you

2   know, anything but a minute fraction of the covered crimes

3   could properly be characterized as terrorism.

4         And I think People v. Knox, which is the New York sex

5   offender mislabeling case, really exemplifies the way in

6   which, you know, a fraction of charged criminal conduct might

7   not fit a given label.  And that doesn't make the label

8   irrational necessarily, although some courts have found the

9   other way.  But you can imagine a situation in which there is

10  a reason to call a broad class of crimes something that might

11  not actually apply to some small percentage of those crimes.

12        In that case, it was about -- it was because of the

13  particular vulnerability of the population and the fact that a

14  sexual component and kidnapping, for example, is frequently

15  hard to prove.

16        THE COURT:  Isn't People vs. Knox that you are

17  relying on for that, though, really distinguishable?  Because

18  what seemed to be driving the court there was the fact that

19  sex offenders have to do something affirmative after the

20  conviction -- they have to go out and register as sex

21  offenders -- which is not the case here.

22        MS. MEEROPOL:  That's right, your Honor.  And,

23  certainly, there is a stronger liberty interest in a situation

24  in which one has to register as a sex offender.  One does not

25  have to register as a terrorist if one is convicted of animal

1    enterprise terrorism.  But that doesn't mean that there isn't

2    a liberty interest here, just as there was in People v. Knox,

3    in avoiding having a misleading and stigmatic title apply to

4    one's criminal conduct that simply doesn't fit.  You know, the

5    word "terrorism," it has implications here.

6          THE COURT:  You argued in your brief that this label

7    could potentially prejudice jurors, but the label is never

8    going to be presented to the jurors.  The government does not

9    have to prove terrorism as an element, as you, yourself, have

10   noted.  The government has agreed they are not going to raise

11   it.  I would grant any type of motion in limine, if we get to

12   that point, precluding them from raising it.  I am not going

13   to instruct them on it.

14          So, terrorism -- the label "terrorism" -- does not

15   even get to the jury.

16          MS. MEEROPOL:  Well, I think your Honor is obviously

17   capable of ensuring that the jury is not prejudiced by the

18   label within your courtroom.  But that doesn't mean that the

19   label won't have implications outside of your courtroom.

20   Individuals who are convicted of animal enterprise terrorism

21   will be known as convicted terrorists.  There's not only --

22          THE COURT:  By who?

23          MS. MEEROPOL:  By the public and the press and the

24   Bureau of Prisons, as well.

25          So, I would say the most concrete example of how this

1  can function to actually impact an individual relates to

2  conditions of confinement, although that's not the only way in

3  which the word has meaning.

4          But within the Bureau of Prisons, an individual

5  convicted of a crime related to terrorism is eligible for

6  placement in a communication management unit.  These are

7  incredibly restrictive units which limit individuals'

8  opportunity to communicate with the outside world much more

9  strictly than --

10          THE COURT:  What -- I'm sorry.  Go ahead and finish.

11          MS. MEEROPOL:  -- than the general prison population.

12          THE COURT:  What makes something related to terrorism

13  for purposes of the BOP?  Isn't it the Sentencing Guideline

14  enhancement that defines terrorism, which is not an

15  enhancement that is applicable here?

16          MS. MEEROPOL:  No, your Honor.

17          So, the rules about CMU placement are actually the

18  subject of litigation right now in the District of Columbia,

19  which is my case, as well, which is why I know a bit about

20  this.

21          THE COURT:  It is very helpful.

22          MS. MEEROPOL:  There's a pending procedural due

23  process challenge.  And part of that challenge is about sort

24  of the fact that it's not really clear how the criteria

25  applies.  We do know that the counter-terrorism unit of the

1    Bureau of Prisons considers sort of individuals for placement

2    in this unit based on a number of factors.  And one of those

3    factors is that the crime or the underlying criminal conduct

4    relates to terrorism.

5         And that's understood pretty broadly.  So, I think,

6    you know --

7         THE COURT:  Wouldn't that require an element of the

8    crime, though, to relate to terrorism?

9         Again, we have a label here, which there is no

10   evidence that BOP will even know that label is attached here

11   because none of the elements relate to terrorism.

12        MS. MEEROPOL:  Well, the government did acknowledge

13   that one individual convicted of animal enterprise terrorism

14   has served time in a CMU.  And another convicted of animal

15   enterprise terrorism, when the statute was called the Animal

16   Enterprise Protection Act -- but even then the crime still

17   carried the title "Animal Enterprise Terrorism"; I honestly

18   don't know why, but that was how -- the language that was used

19   -- also served time in a CMU.

20        So, that's two examples right there.

21        And what we know from the way that the CMU operates

22   is that this word in there will come to the attention of the

23   counter-terrorism unit and will at least prompt consideration.

24        Now, I'm not arguing that someone convicted of animal

25   enterprise terrorism will automatically be placed in a CMU.  I

1    don't think that's an accurate argument.  But they will be

2    considered in a way that other individuals won't.  They are

3    much more likely to end up in this unit than other

4    individuals.  And they are almost certain to have all of their

5    communication monitored by the counter-terrorism unit of the

6    Bureau of Prisons for the time that they are in custody.

7              That is a real-life implication.

8              THE COURT:  Do you have any evidence of that?

9              MS. MEEROPOL:  Well, we know that the counter -- it

10   is publicly available information that the counter-terrorism

11   unit's primary responsibility within the Bureau of Prisons --

12   I think this is something that the Court can take judicial

13   notice of -- is to monitor terrorist prisoners inside the

14   Bureau of Prisons.  So, the word "terrorism," it's just -- it

15   defies belief that an individual convicted of terrorism is

16   going to escape attention by the counter-terrorism unit.

17             Moreover, your Honor, the precedent instructs us that

18   one doesn't have to have a particularly significant liberty

19   interest to still be deserving of rational basis review here.

20   The Seventh Circuit has recognized liberty interests like the

21   right to have a mustache or to groom one's hair the way one

22   wants or the right of an undercover -- of an off-duty police

23   officer to offer a motorcycle ride to a young woman.  These

24   are non-fundamental liberty interests.

25             And yet, even when the liberty interest is not

1  particularly fundamental -- and I would argue there's a strong

2  liberty interest here because of the stigma attached to the

3  word "terrorism."  But even when there's a very minimal

4  liberty interest --

5          THE COURT:  But that is not necessarily what would

6  define a liberty interest, is it?

7          MS. MEEROPOL:  I'm not sure I understand the

8  question.

9          THE COURT:  I think you need to define what the

10  interest is and the implications from the interest, rather

11  than -- so there is a label attached, but what are the

12  implications of that to define what the liberty interest is?

13          MS. MEEROPOL:  That's right.  The liberty interest is

14  in not having a misleading label attached to one's crime.  And

15  the implication of that liberty interest in a case where the

16  label is terrorism is, you know, not only the possibility of

17  different treatment within the Bureau of Prisons, but also the

18  stigmatic effect of being convicted of terrorism and having to

19  potentially disclose that conviction to people in your

20  community, to potential employers, having the press report on

21  it as a terrorism conviction, as they have in past cases.

22          So, given that the Seventh Circuit has recognized the

23  necessity of conducting rational basis review for even

24  extremely minimal liberty interests, you know, the interests

25  of not having a misleading label attached to one's crime

1    surely at least requires rational basis review.

2           Now, rational basis review is incredibly deferential,

3    and that brings us back to where we started where I was

4    addressing your Honor's question about what could the

5    government's rationale be here.  And I had gotten through one,

6    but I do want to get back to the other one -- the other

7    possibility, which the government raises in their briefs,

8    which is that it's rational to call this animal enterprise

9    terrorism because of some violence and violent rhetoric by

10   some animal rights activists.

11          And this is really an argument that because there is

12   a small fraction of criminal conduct that could properly be

13   characterized as terrorism, it is rational to call all

14   conduct -- all criminal conduct -- against animal enterprises

15   terrorism, whether or not the conduct fits that description at

16   all or not.

17          And given that (a)(2)(A) is so clearly addressed to

18   causing the loss of property, there's simply no reason to

19   think it's going to be anything but a tiny margin of cases.

20          THE COURT:  But is it a tiny margin if you look at

21   the legislative history?  One of the representatives said that

22   there had been some 1100 complaints involving violent

23   incidents, involving more than 120 million in property losses.

24   Can we characterize that as small?

25          MS. MEEROPOL:  Well, there has never been a single

1    injury or death to a human being caused by an animal rights

2    activist in this country, ever.

3         What the government really points to is rising

4    property damage, which at times can occur in a way that is

5    risky to human life.  But that is in a -- and the government's

6    own exhibits acknowledge, that that is in a -- very small

7    minority of cases.  And it's really -- I think the

8    government's exhibits point more to a rise in violent rhetoric

9    by some at the very fringe of this movement as an explanation

10   for Congress's purpose here.

11        But one can imagine by analogy that Congress decides

12   that, you know, okay, some murders occur in the course of a

13   burglary, so we're going to call all burglary murder.  It's

14   probably a greater percentage than there is in this case.

15        But it's not rational because the label is so

16   misleading.  Because terrorism has a meaning that the

17   community understands.  And to call property crime terrorism

18   because a tiny bit of the covered property crime could

19   potentially be terrorism is so exaggerated and punitive as to

20   simply not be reasonable.

21             THE COURT:  I want to go back to your original

22   argument about what the liberty interest is here.

23             MS. MEEROPOL:  Uh-huh.

24             THE COURT:  And you said it is the stigma --

25             MS. MEEROPOL:  Yes.

1          THE COURT:  -- of having a mislabel.

2          Have you found any cases that say that a stigma alone

3   is enough to be a liberty interest?

4          MS. MEEROPOL:  Well, this isn't a procedural due

5   process context where a stigma-plus would be required.

6          THE COURT:  Right.

7          MS. MEEROPOL:  So, you know, I think People v. Knox

8   is an example where the stigma -- well, I guess that's not

9   fair actually because there was --

10          THE COURT:  They did not find there was a rational

11  basis?

12          MS. MEEROPOL:  Yeah.  There was more than just stigma

13  there in terms of the reporting requirements.

14          But the proper comparison here is, you know, what's

15  the stigma of having a misleading label attached to your crime

16  compared to the other non-fundamental liberties that give rise

17  to rational basis review.

18          And there, I think it's very important for the Court

19  to reference the Seventh Circuit cases that we cited in our

20  briefs that, you know, involve incredibly minimal liberty

21  interests.

22          THE COURT:  Okay.

23          MS. MEEROPOL:  Unless the Court has any other

24  questions, I will save some time for rebuttal.

25          THE COURT:  I do not have any additional questions

1    for you.

2            Thank you.

3            MS. MEEROPOL:  Thank you, your Honor.

4            THE COURT:  Ms. Biesenthal.

5            If you would not mind, please, addressing the

6    arguments in the same order.

7            MS. BIESENTHAL:  Sure.  Thank you, Judge.

8            So, starting with the defendants' argument concerning

9    the overbreadth of the statute, I know your Honor is aware of

10   this; but, as an initial matter, there is an almost

11   insurmountable battle here for the defendants in having a

12   statute invalidated based on overbreadth for First Amendment

13   concerns.  The government cited several of those cases in its

14   brief, and I think it's not in dispute that there is a very

15   high standard here that the defendants face.

16           THE COURT:  I think the Supreme Court has said only

17   as a last resort.

18           MS. BIESENTHAL:  Only as a last resort.  And, Judge,

19   this case is certainly not a last resort.

20           What we have here is a statute in which Congress has

21   very clearly criminalized conduct -- damaging or interfering

22   with an animal enterprise.

23           Now, defendants have argued that the terms of the

24   statute encompass what could be First Amendment protected

25   activity.  There's been a lot of discussion, in both the

1   briefs and then today, about the plain meaning of the words

2   that are contained within the statute and rules of

3   construction, as far as reading the statute.  From the

4   government's perspective, those arguments don't matter as

5   much, but I do want to focus just on two things briefly.

6        The first is the defendants' statements repeatedly

7   that the government has conceded that the plain meaning of

8   "property" includes intangible property, which would include

9   lost profits.  The government has in no way conceded that the

10  plain meaning of the word "property" must include intangible

11  property.

12       The government does concede that that is one way to

13  interpret the word "property," and that it has been

14  interpreted that way in other statutes.  But it's the

15  government's position that it is also just as likely that the

16  word "property" does not include intangibles and does not

17  include lost profits.

18       And that is particularly true in the case like this

19  where, if you look at the statute as a whole instead of just

20  looking at that one particular word, it's very clear what

21  Congress intended to criminalize.  And they did not intend to

22  criminalize lost profit as a result of peaceful demonstration

23  or peaceful protest.

24       The second thing that I wanted to briefly touch on,

25  as far as the rules of construction, is the defense's argument

1  that the term -- the word "use" -- property that is used by an

2  animal enterprise, that that could include money.

3          Well, of course it could include money.  Money is

4  actually property.  That is not an intangible that we're

5  talking about.  Money that an animal enterprise holds at a

6  given moment is their property.  If a cash register is filled

7  with cash at an animal enterprise and that cash is stolen,

8  it's property under any definition of "property," intangible

9  or otherwise.

10          What we're focusing on -- and what the defense's

11  argument is actually focusing on -- is this intangible lost

12  profit, reputation.  And what the defense didn't argue when

13  they stood before your Honor is that an animal enterprise can

14  in some way use their lost profit.  Not the money that they

15  have, but future lost profit or reputation.

16          Now, turning to the reasons why I think those

17  arguments about the plain meaning of the word "property" and

18  the rules of construction aren't necessarily as important in

19  this case.  And that's because Congress, looking at what it is

20  that they were intending to criminalize, wanted to make it

21  painfully clear what it was that was criminal under this

22  statute; and, so, they did so.

23          They did it in two different ways.  First, when they

24  defined "economic damages" in the penalty provision, they

25  expressly made exempt any financial damages that are the

1    result of a lawful boycott, lawful disruption of an animal

2    enterprise.  They made it as clear as they possibly could.

3    The thing that the defense is worried is criminalized under

4    this statute is expressly exempt.

5            If that couldn't be any more clear, they include an

6    actual rule of construction that says peaceful protest and

7    peaceful demonstration are expressly exempt from this statute.

8    Two different places in the statute where they made it as

9    clear as they possibly could.  "Our intent -- " Congress's

10   intent " -- is to make sure that animal rights activists are

11   able to lawfully protest, to peacefully demonstrate, but that

12   they are not permitted to use illegal action to damage an

13   animal enterprise."

14           THE COURT:  Ms. Biesenthal, the government did not

15   rely on Blum vs. Holder, et al., in its submission.  And the

16   court specifically addressed the rules of the construction in

17   there.

18           Especially given that there is no case law in this

19   area other than that case and Buddenberg, why didn't you cite

20   that or rely on it; and, what are you suggesting to the Court

21   or what should the Court read from that?

22           MS. BIESENTHAL:  The reason that the government

23   didn't rely on it expressly in their submissions is because it

24   was the government's position that that finding and the

25   opinion was based primarily on a standing issue.  Obviously,

1     the government --

2             THE COURT:  And I do not disagree with that premise,

3     but the Court did go on to talk about rules of construction

4     and why there was not a real threat there to the individual

5     Act.

6             MS. BIESENTHAL:  The Court did go on to make those

7     findings, and the government fully agrees with what the court

8     stated in Blum vs. Holder.  We just didn't rely on it because

9     it was a standing issue.  But we do agree exactly with what

10    they've been saying that to -- what the court --

11            THE COURT:  Okay.

12            MS. BIESENTHAL:  -- relied on in that case for its

13    reason in finding that there were sufficient safeguards to

14    make sure that the government is not able to criminalize what

15    would be First Amendment protected activity.

16            Judge, as far as, then, the limiting instruction, the

17    instruction that says no First Amendment activity is

18    criminalized under the statute, the defense, recognizing the

19    problem with that -- that Congress did make it as clear as

20    they possibly could that peaceful protest and peaceful

21    demonstration are perfectly acceptable under the statute --

22    have tried to argue that that savings clause can't save an

23    otherwise invalid or unlawful statute.

24            But the statute itself is not invalid.  It's not

25    unlawful.  And looking at just the plain meaning of it, it's

1    incredibly clear what it is that's criminal.  And what's

2    criminal is unlawful, illegal damage to an animal enterprise.

3          In their reply brief, the defense noted that the

4    government's reliance on the fact that the FACE Act -- which

5    is the abortion clinic entrance act -- their savings clause

6    has been upheld, which is exactly identical to the savings

7    clause in the AETA, in the statute before your Honor.

8          They tried to differentiate that by stating that that

9    statute is different because the FACE statute only

10   criminalizes, I believe they said, force, threats of force or

11   physical disruption.  But in looking at the statute, that

12   isn't actually true.  The third prong of the FACE statute

13   covers exactly what we have in this case, which is to say

14   intentionally damages or destroys the property of a facility,

15   or attempts to do so, because such facility provides

16   reproductive health services.  It's almost the exact same

17   language.

18         That statute criminalizes the intentional damage of

19   property to a reproductive health services clinic.  It then

20   has a savings clause exactly identical to the one in this

21   case, which has been upheld.

22         So, in sum, as far as the overbreadth argument goes,

23   your Honor, again, I cannot repeat it enough that the statute

24   has two different places where Congress has made as clear as

25   humanly possible to anyone reading the statute that this does

1    not criminalize First Amendment protected activity, and that

2    it does not criminalize peaceful protest.  It does not

3    criminalize peaceful demonstration.

4          And one last comment on that point.  I think the

5    defendant said several times that this statute is confusing.

6    And in reading the statute and just reading it for what it is

7    and just looking at the words that are on the page, it's not

8    confusing.  I think the only way that it becomes confusing is

9    when you try to make it confusing.

10         THE COURT:  Can the Court look to the rules of

11   construction -- which clearly say it does not cover First

12   Amendment.

13         But can the Court look to the rules of construction

14   in construing the statute in the first instance, or does the

15   Court first have to decide in construing the statute, separate

16   and apart from the rules of construction, whether or not it is

17   constitutional?

18         MS. BIESENTHAL:  I think the Court can look at them

19   in conjunction.  I think it can look at it as a whole.

20         The case law is clear that the savings clause will

21   not save an otherwise completely invalid statute.  So, I think

22   the Court does need to look and say whether or not the statute

23   would be completely invalid without the savings clause.

24         But looking at the two things together, it's clear

25   Congress's intent.  So, it informs the Court's decision in

1    looking at this plain language of the statute.  It can't be

2    completely separated because it expresses Congress's intent,

3    which is what your Honor is tasked with doing in looking at

4    and interpreting what the statute is meant to criminalize.

5            THE COURT:  What role should the legislative history

6    have for the Court in construing the statute up front?

7            MS. BIESENTHAL:  I think the legislative history

8    should definitely play a part in your Honor's decision in

9    looking at what the statute is meant to criminalize.  The

10   legislative history is important so that your Honor has an

11   understanding as to what it is Congress wanted to do.

12           The legislative history in this case makes clear that

13   what Congress was concerned about is an unlawful underground

14   campaign against people who are lawfully working in this

15   country.  And that concern is then ameliorated by the language

16   that's placed within the statute itself that makes it unlawful

17   to damage intentionally -- using interstate commerce for the

18   purpose of damaging intentionally one of those animal

19   enterprises.

20           The important thing about the legislative history,

21   though, is that it makes clear that Congress did not intend to

22   criminalize peaceful protest or peaceful demonstration.

23           So, when your Honor is looking at the statute, your

24   Honor absolutely should take into consideration everything

25   your Honor knows about Congress's intent.  The beauty of the

 1    way that this statute is written, though, is that your Honor

 2    doesn't -- isn't left wondering.  No one's left wondering as

 3    to what their intent was because of those two express

 4    provisions within the statute that expressly exempted any kind

 5    of First Amendment protected activity.

 6              And if your Honor has no other questions on

 7    overbreadth --

 8              THE COURT:  I do not.  You may turn to void for

 9    vagueness.

10              MS. BIESENTHAL:  So, next moving to void for

11    vagueness -- and I know your Honor had some questions about

12    this.

13              THE COURT:  I did because your -- there are two ways

14    that a statute can be voided for vagueness.  One is the notice

15    requirement, and one is the enforcement -- the discriminatory

16    enforcement.

17              Your response brief seemed to focus on the notice and

18    not the discriminatory enforcement.  So, that's what I would

19    like you to address today.

20              MS. BIESENTHAL:  And it did.  And if I could give

21    your Honor some just background on why it did.

22              I think the government's understanding of the defense

23    argument in their opening brief is different than the

24    government's understanding of their argument now.

25              The government's understanding from the opening brief

1    was that the defense was making a broader attack on the

2    statute; that the defense was arguing that the statute was so

3    vague that it implicated First Amendment concerns, sort of

4    melding their vagueness argument with their overbreadth

5    argument, which is why the government responded the way that

6    it did and why the government did not challenge the

7    defendants' standing to make the argument that they're making.

8            As I understand it today, based on their reply brief

9    and their arguments to your Honor, their vagueness argument is

10   now a very limited argument and they're only asserting that

11   the definition of "animal enterprise" is overly broad.

12           In that case --

13           THE COURT:  And leads to discriminatory enforcement.

14           MS. BIESENTHAL:  And leads to discriminatory

15   enforcement.

16           In that case, there's no First Amendment implication

17   whatsoever to the defendants' argument.  The fact that the

18   "animal enterprise" definition may be overly broad and lead to

19   discriminatory enforcement does not implicate the First

20   Amendment.  And, so, the defense actually has no standing to

21   attack the statute facially for vagueness.

22           It's Black Letter Law, and I have cases for your

23   Honor if your Honor wants to see them, that in order to attack

24   facially a statute for void for vagueness, the argument must

25   implicate First Amendment concerns.  If it does not, the

 1    defense is left with only an as-applied attack to the statute.

 2        Here -- so, assuming that the defense argument is

 3    this limited piece, that it's only the definition of "animal

 4    enterprise" that's problematic from a vagueness standpoint,

 5    they are limited to an as-applied attack.

 6        And here, there is absolutely no way that this

 7    statute is vague as applied to defendant Johnson and defendant

 8    Lang's conduct.  Your Honor is familiar with the facts of the

 9    case --

10        THE COURT:  And I think they said it is only a facial

11    challenge that they are pursuing.  On rebuttal, she can

12    confirm that.  But they are not arguing as applied on this --

13    on void for vagueness.

14        MS. BIESENTHAL:  It's the government's position that

15    they're only permitted to argue as applied, though.

16        THE COURT:  I understand.

17        MS. BIESENTHAL:  So --

18        THE COURT:  But I do not think they are arguing that.

19        But go ahead.  Go ahead.

20        MS. BIESENTHAL:  I just want to make sure I'm not

21    waiving any argument for the record, Judge.  That it's our

22    position that at this point, if they're only arguing animal

23    enterprise, they are not arguing First Amendment has been

24    implicated; and, they are left with only an as-applied attack,

25    which they lose because the statute is incredibly clear that

1   animal enterprise includes both a breeder and a furrier, which

2   is exactly what the defendants have been charged with.

3         Now, giving the defense the benefit of the doubt and

4   assuming that they are arguing that First Amendment concerns

5   are implicated and they do have standing to facially attack

6   the statute as being vague, they still lose.  And the reason

7   is, is because the statute is clear and gives no discretion to

8   law enforcement as to what is actually criminal.

9         The government concedes that the definition of

10  "animal enterprise" is broad and it includes a lot of

11  different things.  But it does not give law enforcement the

12  discretion to decide what is or is not criminal under the

13  statute.  That part of the statute is clear.

14        Yes, it criminalizes potentially a lot of different

15  conduct that ordinarily, historically would be something

16  that's left to the state to punish.  But that doesn't

17  invalidate the statute, and it doesn't give law enforcement

18  the type of discretion as contemplated by these other cases

19  that the defense has cited where the statute is actually void

20  for vagueness because of the ability of law enforcement to use

21  too much discretion.

22        In those cases, what's clear is that law enforcement

23  is given too much discretion to decide what is criminal.  So,

24  the examples that the defendant has cited:  What is vagrant?

25  What kind of conduct ends up being vagrant?  What kind of

1  conduct is annoying?  What kind of conduct is oppressive?  We

2  don't have those kinds of words in this statute that gives law

3  enforcement any type of discretion to determine what is

4  violated by the statute.

5      To use the defense's example from their reply brief,

6  if someone throws a rock through a window at a Whole Foods,

7  they're guilty of a crime.  If they used interstate commerce

8  for the purpose of throwing the rock through the window at the

9  Whole Foods, they could be guilty under this particular

10 statute.  The government's not arguing that they couldn't.

11     But there's no discretion there.  Law enforcement

12 sees someone throw a rock through the window at the Whole

13 Foods, there's no discretion to determine whether that's a

14 crime.  It is.  It's clear it's a crime.

15     The issue becomes that there is some discretion,

16 then, as to whether the federal government ends up charging

17 the case or it's a state case.  But that's a different issue.

18 That's not the vagueness doctrine, and it's not the examples

19 that have been cited by the defense where there's this

20 question left to law enforcement that it's up to them to

21 decide whether a crime has actually occurred.

22     Here, no discretion; crime has occurred.  The

23 question then is whether the federal government's going to

24 take it or the state's going to take it, which is something

25 that doesn't invalidate a statute.  And it's clear that that

1   kind of discretion does not invalidate a statute, just in

2   looking at the drug crimes or, another example, with mail and

3   wire fraud.

4        Mail and wire fraud statutes criminalize what could

5   be breach of contract cases and state cases all the time.

6   There have been vagueness challenges to the mail and wire

7   fraud statutes for the exact reasons that the defense is

8   positing.  One of them is in United States vs. Hausmann, which

9   I'll provide to your Honor.

10        In that case, the defendants argued that the mail and

11   wire fraud statutes were unconstitutionally vague for this

12   exact reason -- that they criminalized what could be breach of

13   contract cases or state cases.  And in that case, the Seventh

14   Circuit was very clear that Congress has the authority to

15   regulate the use of interstate mailings and interstate wires

16   to criminalize conduct.

17        THE COURT:  Do you want to put the cite for that on

18   the record, if you have it?

19        MS. BIESENTHAL:  345 F.3d 952.

20        And the court in that case stated, "Without some

21   showing that either the statute in question or the prosecution

22   of this case contravenes some specific rule of constitutional

23   statutory law, the mere fact that the conduct in question is

24   of a sort traditionally dealt with through state law cannot

25   serve as a basis for dismissing the indictment.

1       So, in sum, Judge, what we have here is a case where,

2  again, it's our position that the defense does not have

3  standing to facially attack this statute.  They only have an

4  as-applied challenge, which they lose.  But assuming that they

5  are able to facially attack this statute, what we have here is

6  not a vague statute that allows law enforcement discretion to

7  decide whether something is a crime.  Instead, we have a clear

8  statute that does criminalize a broad range of conduct, but

9  then it's left to the discretion of the prosecution to decide

10 whether it's charged federally or state, which is a completely

11 separate issue than vagueness.

12      THE COURT:  Ms. Biesenthal, do you want to put on the

13 record the case names and cites for your first proposition,

14 that they do not have standing to facially attack the statute

15 if it does not raise a First Amendment concern?

16      MS. BIESENTHAL:  I will.  That's U.S. vs. Stephenson,

17 557 F.3d 449, and Chapman vs. United States, 500 U.S. 453.

18      And, Judge, I wanted to just respond, before I move

19 on to the due process argument -- unless your Honor --

20      THE COURT:  No.

21      MS. BIESENTHAL:  -- has more questions about

22 vagueness, I did want to respond to something that the defense

23 said as far as the vagueness goes and as far as the

24 discriminatory enforcement of the statute.

25      The defense stated that the government is using this

1   statute against the unpopular group of animal rights

2   activists.  And as I stated in my overbreadth argument, I will

3   state, again:  That's not how the government is using this.

4   It's not meant to criminalize the lawful activity of animal

5   rights groups activists.  What it is meant to do is

6   criminalize the illegal damage to animal enterprises.  It's

7   intended to criminalize crime, not lawful protest and not

8   lawful activism.

9         Now, as far as the terrorism argument, the due

10  process argument -- and, again, here I know I don't need to

11  keep saying it, but this is an almost insurmountable battle,

12  as well, for the defense in having a statute overturned for

13  violating substantive due process, especially for something

14  like this.

15        Here, it's the government's primary argument that

16  there is no liberty interest at stake whatsoever because the

17  defendants are not labeled as anything.  Defense, during her

18  argument, repeatedly stated that Congress named the statute

19  "Animal Enterprise Terrorism."  Congress didn't name the

20  statute anything.  This statute is referred to as the Animal

21  Enterprise Terrorism Act.  It's not codified as a terrorism

22  Act.  It's not one of the Acts that is under terrorism

23  statutes.  It doesn't even have a terrorism sentencing

24  enhancement applied to it.

25        So, the defense -- the defendants, in being charged

1    under a statute, are not labeled as anything.  They have no

2    title at all.

3          Now, moving on to the defendants' arguments, then,

4    about the possible liberty interests that would be at stake if

5    your Honor does find that the defendants are in some way

6    labeled as something, the defense has argued primarily that

7    the issues at stake for them are the social stigma, the issue

8    of juror pool outside of the courtroom, the issue of possible

9    disclosure of this offense as a terrorist act to the public

10   and the press and the Bureau of Prisons.

11         I'll start with the first chunk of arguments first

12   because I think that those are easily disposed of, because the

13   government has not ever referred to either defendant as a

14   terrorist and never will.  There is no social stigma attached

15   to what the defendants have been charged with from the

16   government's perspective.  And it's -- frankly, the defense

17   loses credibility in arguing that there's a social stigma

18   issue and that there's a problem with the press labelling the

19   defendants as terrorists or their friends or the potential

20   jury pool when they are the only ones who have ever called the

21   defendants terrorists.

22         They are the only ones who have spoken to the press

23   about what the defendants have been labeled as purportedly.

24   They are the only ones who have issued press releases on their

25   own Web sites about what the defendants have been labeled as.

1          THE COURT:  Was there a press release from law

2     enforcement?  I thought there was some suggestion that there

3     was a press release when this case was originally indicted

4     referring to --

5          MS. BIESENTHAL:  I don't believe -- I'm sorry, Judge.

6          THE COURT:  -- referring to the Act as the Animal

7     Enterprise Terrorism Act.

8          MS. BIESENTHAL:  I don't believe that the press

9     release had to do with this case.  I might be wrong.

10          THE COURT:  Okay.

11          MS. BIESENTHAL:  I'm sure I'll be corrected if I'm

12     wrong.

13          I don't believe that the press release was for this

14     case.  I believe it was for another case.

15          When your Honor mentioned that you would grant a

16     motion to exclude any reference to the term "terrorism" that

17     was presented by the defense, the government will be moving in

18     limine to prevent any reference to the word "terrorism" at

19     trial.  And, so, I think we are all in agreement that no one

20     is calling the defendants terrorists.

21          The reason no one is calling the defendants

22     terrorists is because, from the government's perspective, it's

23     completely irrelevant.  We have no need to establish that the

24     defendants are terrorists in order to establish our case.  And

25     we have never told the press that they are terrorists, and we

1    do not plan on doing so.

2           So, there's no social stigma, from the government's

3    perspective or from anything that the government has done.

4           As far as the Bureau of Prisons, the defense is

5    correct, that because this statute is known as "Animal

6    Enterprise Terrorist Act," for a BOP designation, the case

7    will be seen by a counter-terrorism unit employee in

8    determining designation.  But that's all it is.  There's no

9    practical effect to the fact that that case is being referred

10   to a counter-terrorism unit employee other than that employee

11   looks at the facts of the cases, like they do with every

12   single case that comes before them, in order to determine

13   whether and where someone should be designated.

14          So, the fact that, say, one of the defendants in this

15   case is ultimately convicted and that is then sent to the

16   counter-terrorism unit, they will look at the background of

17   the defendant; they will look at the facts of the case; and,

18   they will look at the behavior of the defendant for the time

19   -- in Mr. Johnson's respect, at least, that he's had time

20   incarcerated prior to, assuming there's a conviction -- look

21   at that time and determine, those things as a whole, what unit

22   that particular prisoner should be placed in.

23          THE COURT:  And is that triggered solely by what the

24   statute is referred to as?

25          MS. BIESENTHAL:  In this case, it is.  That's my

1   understanding, that it is.  That if there is a conviction

2   under this statute, it will be referred to the

3   counter-terrorism unit.

4           THE COURT:  You submitted, in your response brief,

5   some statements of individuals from BOP and summarized those.

6   Can the Court rely on that at this stage without hearing

7   evidence on it?

8           MS. BIESENTHAL:  I think that the government can rely

9   on -- or the Court can rely on a government proffer and take

10  that for the weight that the Court wants to give it.

11          In our brief, we did say that we would be more than

12  happy to make that individual available.  That offer still

13  stands if the Court is inclined to grant the defense motion on

14  this issue.  We absolutely will bring him before your Honor.

15  And we can do that as quickly as possible.

16          Your Honor, the last thing is as far as whether this

17  is rationally related to -- whether Congress has a rational

18  interest in actually criminalizing this as terrorism.  So, now

19  we're assuming that the defendants are labeled as something,

20  and then we're assuming that there is some kind of liberty

21  interest attached to that label.

22          Up until this point, the government has not set forth

23  a significant amount of information about why it is that it's

24  the government's belief that the Congress did have a rational

25  interest in actually criminalizing this conduct as terrorism.

1          The reason that the government has not proffered a

2     significant amount of information on that point is because up

3     until now, the defense has objected specifically to an amicus

4     brief being filed that argued that position.  And they argued

5     it would be prejudicial to the defendants moving forward in

6     the case for the government, or anyone else for that matter,

7     to proffer a lot of information about the animal rights

8     extremist campaign and some of the reasons that this was

9     brought to Congress as a "terrorist act," if your Honor

10    believes that that's what it's been labeled.

11         If your Honor is inclined to grant the defendants'

12    motion in that respect, the government certainly is ready now

13    to argue why it is rationally related -- or why Congress has a

14    rational interest, rather, in criminalizing this as terror.

15         THE COURT:  I am not giving an inclination one way or

16    the other, but for the record, why don't you make your

17    "rationally related" argument.

18         MS. BIESENTHAL:  Judge, first of all, the defense has

19    argued repeatedly that in order for something to be considered

20    terrorism, it has to be a violent act.  In support of their

21    argument that an act of terrorism has to be a violent act,

22    they have cited definitions of international terrorism.  These

23    acts, obviously, are not acts of international terrorism.

24    Instead, they have been designated by the FBI as acts of

25    domestic terrorism.

 1          The definition of "domestic terrorism," which is

 2     under title 18 U.S.C., Section 2331, states, "Involving acts

 3     dangerous to human life that violate federal or state law and

 4     appear intended to intimidate or coerce a civilian

 5     population," which is a very different definition than one

 6     that involves only violent acts.  Acts that are dangerous to

 7     human life involve a significant amount more than truly

 8     violent at their core acts.

 9          In any event, there are acts that are codified under

10     the terrorism statutes that don't involve actual violent acts.

11     Those include crimes relating to computer attacks and

12     government contracts, which is 18 U.S.C., Section

13     2332b(g)(5)(B).

14          Now, in any event, even setting aside the definitions

15     and the government's dispute with the defense definition of

16     what terrorism is and what something needs to be in order to

17     be terrorism, the defense is arguing to your Honor, and in

18     their briefs has argued to your Honor, the conduct of the

19     defendants in a vacuum.

20          What they've argued is only this one release of mink,

21     and that the three times that this case -- that this statute

22     has been charged, that it's involved release of animals and

23     that those are not violent acts.

24          First of all, just looking at those acts

25     themselves -- trespassing onto an individual's property in the

1   middle of the night, committing damage upon their property,

2   and releasing all of the animals that they have purchased and

3   that they are breeding -- involves an act that's dangerous to

4   human life.

5            Trespassing in the middle of the night in order to

6   instill fear and to attempt to get a lawful, law-abiding

7   citizen to stop doing what they're doing not lawfully, not

8   through lawful protests, but through instilling fear and

9   strong-arming is terror.

10           Setting that aside, the animal rights extremist

11  campaign -- and I want to be very clear that I am not talking

12  about animal rights activists.  I am not talking about lawful

13  protests.  I am talking about the underground campaign that

14  was referred to by the FBI in asking Congress to enact this

15  statute.  That campaign involves a lot more than just

16  releasing mink.  And the defense has said that that didn't

17  involve any acts that have ever actually physically harmed a

18  particular individual.

19           I ask your Honor in deciding this case, in deciding

20  this issue, to look at the government's submission in moving

21  to detain Kevin Johnson.  Setting aside all the information

22  that the government has about things that have been done by

23  the animal rights extremist movement leading up to the

24  enactment of this particular statute, just look at what the

25  government has proffered has been done by Kevin Johnson in

1    support of his unlawful campaign.

2              There has been stalking.  There has been property

3    damage.  There has been storming a bank where people are

4    working.  There has been hanging out outside of people's homes

5    screaming they're going to burn their homes down and telling

6    them that they know who their children are.  Those acts are

7    rationally related to an interest in criminalizing that

8    campaign as one of terror.

9              Now, the government also has cited to your Honor the

10   examples that were made by the FBI Director to Congress, which

11   includes arson, which includes the use of explosive devices,

12   which includes stalking, which includes the collection of

13   personal information about law-abiding citizens and their

14   children.  The government and Congress had a rational interest

15   in defining these particular crimes as terror.

16             So, even if your Honor finds that the defendants have

17   been labeled as something -- which they haven't -- and even if

18   your Honor finds that there's a liberty interest at stake

19   based on that label -- which there isn't -- there was a

20   rational interest in actually criminalizing that conduct as

21   terror.

22             And if your Honor has no further questions --

23             THE COURT:  I do not believe I do.  Just give me one

24   second, please.

25        (Brief pause.)

1          THE COURT:  I do not.  Thank you.

2          MS. BIESENTHAL:  Thank you, Judge.

3          THE COURT:  Rebuttal?

4          MS. MEEROPOL:  Thank you, your Honor.

5          A few points to go over.  First, the government has

6    argued that (a)(2)(A) should be interpreted not to apply to

7    lost profits that result from First Amendment protected

8    activity.  It's a combination of both aspects in terms of

9    their interpretation of (a)(2)(A).

10          So, it's still not clear to me whether the government

11   interprets (a)(2)(A) to limit liability based on causing loss

12   to intangible property or only limit liability arising from

13   First Amendment protected activity that causes loss to

14   intangible property.

15          And that's a major problem in the interpretation of

16   the statute, because individuals not before the Court must

17   have notice of what is illegal under the operative provision

18   of the statute.

19          Now, the government argued that money is tangible

20   property, and that we are concerned only with loss of profits

21   or business reputation.  But that's not entirely the case,

22   your Honor.  Because increased security costs are also aspects

23   that could frequently arise from First Amendment protected

24   activity.  There's a protest outside an animal enterprise and

25   the enterprise hires an extra security guard, that causes the

 1    loss of in-the-pocket, currently-owned money which arises from

 2    First Amendment protected activity.

 3            And relevant to that point, in a prior prosecution

 4    under the Animal Enterprise Protection Act, which includes

 5    similar language about causing the loss of property, the

 6    government included as such loss -- and we cited this in a

 7    footnote of our opening brief -- causing employees to waste

 8    their time; causing a business to purchase new computer

 9    software, to -- additional firewalls and the like.

10            So, there is a history of interpreting this provision

11    to apply to intangible losses.

12            Now, in that case, the court found that the speech

13    that gave rise to those intangible losses wasn't protected

14    speech.  But it was still speech that caused the loss of

15    intangible property.  And that's the history of the

16    enforcement of the statute.

17            The government argued, with respect to economic

18    damage, that economic damage -- that certain types of economic

19    damage -- have specifically been excluded from giving rise to

20    AETA liability.  And that is not the case, your Honor.  What

21    is excluded are certain economic damages cannot give rise to

22    an increased penalty under the Animal Enterprise Terrorism

23    Act.  But that says nothing as to whether those types of

24    economic damages can give rise to a substantive violation of

25    the statute.

1          And there I do want to emphasize one statement from

2   the court -- the government's opening -- the government's

3   opposition brief.

4          On Page 9, they cited United States v. Buddenberg for

5   the proposition that economic damage standing alone cannot

6   give rise to an AETA violation, and the court did not hold

7   that in Buddenberg.  The court held that economic damage

8   standing alone cannot give rise to a violation under a

9   (a)(2)(B) of the statute because (a)(2)(B) requires a threat.

10  The Buddenberg court did not consider whether (a)(2)(A)

11  liability exists for causing economic damage.

12          In Blum -- your Honor asked the government about

13  Blum.  And I think it's important there to emphasize that the

14  First Circuit did not interpret (a)(2)(A)'s reach.  They

15  explicitly considered the district court's finding that the

16  parenthetical limited the broad term "any personal property."

17  They considered the government's argument in that case that

18  used -- limited the proper interpretation of "any personal

19  property."

20          And they decided they didn't have to decide what

21  (a)(2)(A) covers because of the savings clause.  And that's

22  simply not the proper approach in a merits overbreadth

23  analysis where it is a hundred percent clear that the proper

24  first step is to interpret the reach of the statute.

25          The government also directed the Court's attention to

1    the FACE statute.  And I would direct the Court to the

2    "Definitions" section of the FACE statute.  I, unfortunately,

3    don't have it in front of me, but my recollection is that the

4    definitions limit the way in which that statute could be used

5    in a way that is substantially more protective, and that the

6    definitions are what limit the statute's application to

7    protected speech and advocacy, unlike a savings clause in this

8    case.

9            Moving on to the vagueness argument, your Honor, it

10   is correct that we do not make an as-applied vagueness

11   challenge here.  But criminal defendants are allowed to make

12   vagueness facial challenges whether or not the statute

13   implicates First Amendment rights.  The requirement is simply

14   that in that situation, the statute is also vague as applied

15   to them.

16           So, there's not a technical requirement that a

17   criminal defendant can only make an as-applied vagueness

18   challenge.  It's rather that when the Court is considering

19   that vagueness challenge -- the facial vagueness challenge --

20   the Court must also consider how the statute functions with

21   that defendant as an example.

22           Because vagueness -- facial challenges in the First

23   Amendment context provide for relaxation of standing rules.

24   Right?  The First Amendment interest is the reason that an

25   individual innovating this challenge can challenge a statute

1 even if it's not infringing on his or her own First Amendment

2 rights. Without that standing relaxation, a defendant can

3 only bring a facial challenge if the statute is actually vague

4 as applied to them, as well; and, this statute is.

5 And that's because we're not arguing about notice to

6 the individual defendant. We're arguing about inviting

7 discriminatory and arbitrary enforcement. And this is exactly

8 an example of the type of arbitrary and discriminatory

9 enforcement allowed under the statute.

10 THE COURT: And you are saying that it is your

11 position that you can still challenge a statute as void for

12 vagueness in a facial challenge, whether or not First

13 Amendment implications arise?

14 MS. MEEROPOL: That's right, your Honor. And

15 Papachristou is an example of that. That wasn't a First

16 Amendment challenge at all.

17 And the cases that the government cites to, I've only

18 been able to read them quickly, but they don't stand for the

19 proposition that a facial challenge is not proper. They stand

20 for the proposition that the statute must also be measured

21 with respect to the defendants' conduct and the Court must use

22 the example before it when considering the challenge.

23 Turning to the substantive due process claim --

24 THE COURT: Before you turn, do you agree then that

25 your facial challenge on the void for vagueness does not

1    implicate First Amendment concerns?

2           MS. MEEROPOL:  No, your Honor.  If the Court agrees

3    with our interpretation of the statute with the overbreadth

4    argument, then we are in a situation where the statute does

5    implicate First Amendment rights and --

6           THE COURT:  But that is for the overbreadth.  You

7    made a different argument for the void for vagueness.  So, I

8    think you are mixing the two arguments.  Your void for

9    vagueness was focused more on the animal enterprise aspect of

10   it rather than it implicating legitimate First Amendment

11   concerns, as is your overbroad basis.

12          MS. MEEROPOL:  Well, it's both, your Honor.  You

13   know, it is the breadth of the term "animal enterprise" that

14   is important here, but that's not the only part of it.  I

15   believe I said this earlier, that it's also the lack of an

16   actus reus that makes this statute so broad.  And that is

17   completely connected to the First Amendment overbreadth

18   argument that because the criminal conduct isn't specified, it

19   need not necessarily be conduct; it could just as easily be

20   speech.

21          And for that reason, if the Court agrees with the

22   overbreadth claim, then we are in a situation where there's a

23   relaxed standing.

24          But I actually think at the end of the day, it

25   doesn't make that much of a difference because our vagueness

1    argument is the same in either regard.  It's that the statute

2    invites arbitrary and discriminatory enforcement.  And if

3    that's the case, then there's no reason why that also wouldn't

4    follow with respect to this individual prosecution.

5           This is a statute where, you know, it's not about

6    choosing whether there's going to be a federal or state

7    prosecution necessarily.  There already was a state

8    prosecution in this case.

9           The government talks about, you know, the difference

10   in vagueness terms about whether a statute -- it's vague

11   whether the conduct is actually criminalized versus a charging

12   decision.  But, of course, the vagueness here comes from

13   whether the conduct is a federal criminal violation on top of

14   being a state criminal violation.

15          Turning now to --

16          THE COURT:  So, is that what you are arguing, that it

17   makes it void for vagueness because it criminalizes state

18   crimes -- it federalizes state crimes?  Is that what your

19   argument is?

20          MS. MEEROPOL:  Well, because it federalizes such a

21   broad swath of state crimes.  You could imagine a statute that

22   is much more narrowly targeted at animal enterprise extremism.

23   The government -- and this moves a little bit into the

24   substantive due process claim, but the government talked about

25   some specific examples.  And we're not arguing that Congress

1   wouldn't have a legitimate interest in crafting a statute that

2   addresses that type of extreme behavior.  This simply is not

3   that statute.  This is an incredibly broad statute.

4           THE COURT:  Do you have any cases to support your

5   argument that a statute can be void for vagueness because it

6   over-federalizes crimes, which is what I am hearing you say?

7           MS. MEEROPOL:  No, your Honor, I haven't been able to

8   find a particular -- a specific case on point.  The ACCA, the

9   Armed Career Criminal -- I can't remember what the last "A"

10  stands for, but it's currently up before the Supreme Court.

11          THE COURT:  Act.

12          MS. MEEROPOL:  Yes.  That makes sense.

13          We cited it in our briefing.  And it's possible this

14  is actually going to be an issue that the Supreme Court takes

15  up.  We'll have to wait and see what happens with that.

16  But --

17          THE COURT:  And I am not sure if that is the -- maybe

18  you are involved in this one, too, but I am not sure if that

19  is the -- precise issue that is framed before the Supreme

20  Court.

21          MS. MEEROPOL:  No.

22          THE COURT:  I think it is a little bit different.

23          MS. MEEROPOL:  I think that's right, your Honor.  But

24  what makes that analysis relevant is that -- and I'm not

25  involved in this case; so, I have no personal understanding,

1   except what I've read in Supreme Court papers -- but that the

2   definition of what a qualifying offense could be because of

3   the examples that are given are so broad that it could

4   basically apply to almost any federal offense, and that that

5   creates a vagueness problem.

6          So, what I think is somewhat analogous there,

7   although we don't really know if it's analogous until the

8   Supreme Court issues their decision, is just breadth creating

9   vagueness, which is a lesser-developed arm of the vagueness

10  doctrine.

11         But in reading Papachristou carefully, you know,

12  while I will certainly acknowledge that that statute includes

13  incredibly archaic and vague terms, that really wasn't the

14  heart of the Supreme Court's analysis there.  It was about the

15  fact that it casts such a wide net and, thus, allows so much

16  discretion.

17         Now, moving on to some of the substantive due process

18  points, first of all, in terms of the stigma of being labeled

19  a terrorist, the government in the past, in past Animal

20  Enterprise Terrorism Act prosecutions, has issued press

21  releases; has commented on Joint Terrorism Task Force

22  involvement; has referred to the individuals in press releases

23  as terrorizing the public.

24         So, while they have disavowed the intent to do so in

25  this case, it doesn't mean that that doesn't happen.  And we

1   provided examples of the way the press is likely to report

2   this, as well.  Not simply in situations where defendants

3   themselves issue, or defendants' organizations issue, press

4   releases, but where the press independently reports on the

5   nature of the conviction.

6           The government is correct that the statute is not

7   titled, "Animal Enterprise Terrorism."  Rather the Act is

8   codified as being referred to as animal enterprise terrorism.

9   And the preamble of the Act refers to it providing the

10  Department of Justice with the means necessary to fight animal

11  enterprise terrorism.  So, while the title of the statute

12  doesn't exactly include the terms, it is not the case that

13  those terms don't exist with respect to the actual language of

14  the statute.

15          The government acknowledged that an individual

16  convicted under animal enterprise -- of animal enterprise

17  terrorism will be considered by the counter-terrorism unit of

18  the Bureau of Prisons just as would anyone else who comes

19  across their desk.  And that's really the operative term

20  there.  Because not everyone in the Bureau of Prisons comes

21  across the desk of the counter-terrorism unit.

22          And to the extent that there is any question that the

23  stigma of just the word "terrorism" would give rise to a

24  non-fundamental liberty interest, I think that admission

25  answers that question.  This is a real impact -- that this

1   individual will be considered by a counter-terrorism unit

2   specialist within the Bureau of Prisons.

3           The government argued that we have claimed that

4   terrorism is just an act of violence.  And that is not the

5   case, your Honor.  We were explicit in our brief that the

6   consensus about what terrorism is or isn't is an act of

7   violence or a threat of violence or an act that is dangerous

8   to human life.  We acknowledge that that "dangerous to human

9   life" is a different component; that it's in many terrorism

10  definitions; and, it's simply that property crime -- causing

11  the loss of property -- does not require an act that is

12  dangerous to human life.

13          The government says that throwing a rock through the

14  window of Whole Foods is an act of terrorism, that trespass is

15  an act of terrorism because all of that is dangerous to human

16  life.  And that makes the word "terrorism" completely

17  meaningless.

18          And, then, I would refer the Court to the People v.

19  Morales case, which, you know, isn't on point for any sort of

20  particular legal issues -- we cited it at the very end of our

21  opening brief -- but does discuss the importance of not

22  misusing a word like "terrorism," that has a particular

23  meaning, to apply to a broad swath of activity where the label

24  simply doesn't follow.

25          Unless your Honor has any other questions?

1          THE COURT:  You were going to look for -- and I know

2     you only had a short amount of time and you were listening, as

3     well, but you were going to look and see if you had any cases

4     to support savings clauses that were similar to the one used

5     here.

6          Were you able to do that?  If not, I will give you

7     time and you can --

8          MS. MEEROPOL:  Yeah.  No, your Honor.  I would be

9     happy to submit additional briefing on that issue if the Court

10    would find it helpful.  But I think Humanitarian Law Project

11    is a good case to exemplify the way a similar First Amendment

12    savings clause is used by the courts.

13         The Supreme Court didn't explicitly hold one way or

14    the other exactly how the savings clause should operate there.

15    But if you look at the court's analysis, it is crystal clear

16    that they first analyzed the substantive provisions and that

17    that is what must be done.

18         And that's all we're asking this Court to do -- to

19    first analyze the substantive provision.

20         THE COURT:  Okay.

21         Let me just make sure.  I do not think I have any

22    additional questions.

23         I do not.  Thank you.

24         MS. MEEROPOL:  Thank you, your Honor.

25         THE COURT:  I do not want further briefing from

1  anybody unless I ask for it.  So, please, either side, do not

2  submit any additional briefing.

3           Thank you.

4           MS. MEEROPOL:  Thank you, your Honor.

5           THE COURT:  So, I am going to take this under

6  advisement and will certainly issue a written opinion on it.

7           Why don't you come back here -- does March 24th at

8  9:00 a.m. work for you?

9           MS. BIESENTHAL:  That's fine.

10          THE COURT:  Is that okay for the defense?  Mr. Meyer,

11  Mr. Deutsch?

12          MR. MEYER:  It is, Judge.

13          THE COURT:  Mr. Deutsch, does that work?  March 24th.

14          MR. DEUTSCH:  Yes, that's fine.

15          THE COURT:  Okay.

16          March 24th at 9:00 a.m., we will have another status

17  in the case.  And it is my intention to rule on the motion to

18  dismiss before then.

19          Is there any objection to excluding time in the

20  interest of justice, given the pending pretrial motions?

21          MR. DEUTSCH:  No objection for Mr. Johnson.

22          MR. MEYER:  No objection for Mr. Lang, Judge.

23          THE COURT:  Is there anything else for the Court this

24  morning?

25          MS. BIESENTHAL:  Nothing from the government, Judge.

1          THE COURT:  Thank you.

2          MR. MEYER:  Thank you.

3          THE COURT:  I will see you in March.

4                         *     *     *     *     *

5

6    I certify that the foregoing is a correct transcript from the
     record of proceedings in the above-entitled matter.
7

8
     /s/ Joseph Rickhoff                    December 16, 2015
9    Official Court Reporter

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25