UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| vs. | ) | No.   14 CR 390-1 |
| | ) | |
| | ) | Honorable Amy J. St. Eve |
| KEVIN JOHNSON | ) | |

**GOVERNMENT'S RESPONSE TO DEFENDANT'S
SENTENCING MEMORANDUM**

In his sentencing memorandum, defendant asks this Court to sentence him to a below-guidelines sentence of 24 months' imprisonment, with an additional credit for the time he spent in state custody serving a sentence for a different crime. Dkt. 143. The government responds as follows:

**A.    State Time Served**

In addition to asking for a sentence below the applicable guidelines range, defendant requests credit for the 14 months he served in state custody after having been convicted of possession of burglary tools. Defendant argues that the tools he was convicted of possessing are the same tools that he used to vandalize the mink farm and/or that were going to be used to vandalize the fox farm. Dkt. 143 at 6. Defendant goes on to argue that the state "conviction was clearly relevant conduct in relation to the instant offense." Dkt. 143 at 7.

Defendant's argument fails to address the fact that defendant's state sentence was imposed for a crime that is different from the one for which he stands to be sentenced now. Specifically, defendant's sentence in the state system

1

punished defendant for the possession of tools necessary to commit a burglary. The state has an interest in ensuring individuals do not burglarize homes or commercial property within its boundaries, and the state sentence reflects that harm. It did not, however, punish defendant for having committed the vandalism at the mink farm. Nor did it punish defendant for having shut down a lawful business through illegal protest. That is the harm that must be addressed by the sentence imposed in this case.

The guidelines calculation in this case is illustrative of the point. The guidelines range is driven completely by the loss amount suffered by the mink farmers. It is in no way enhanced by the fact that the defendants possessed the tools to commit the vandalism. In addition, the vast majority of the "tools" recovered from defendant's car that were the subject of the state conviction were brand new, meaning they were not used to vandalize the mink farm at all. Instead, those tools were likely going to be used to vandalize the fox or some other farm – also indicative of the fact that the state sentence was not punishment for the vandalism at the mink farm.

While the government agrees that defendant should receive some credit for the time he previously served in state custody, that credit already has been given. Specifically, the parties agreed in defendant's plea agreement that defendant should not receive criminal history points for that conviction. In addition, the government agrees that defendant should receive credit, as calculated by the Bureau of Prisons, for the time in state custody that he served while the federal indictment was

2

pending. A credit in the amount sought by the defendant, however, would undermine the point of this prosecution and the point of defendant's sentence – to adequately reflect the harm that was suffered by the victims (complete financial devastation) and to serve as a general and specific deterrent against unlawful activism.

B. **Criminal History**

Defendant argues that his criminal history category over-represents the seriousness of his criminal past based on the fact that a provision passed in California commuted particular felony offenses to misdemeanors. Dkt. 143 at 4. Specifically, defendant argues that his 2008 and 2012 convictions for burglary were both subsequently reduced to misdemeanor shoplifting offenses. PSR at 8, 10. The felony burglary convictions were commuted to misdemeanors well after defendant was sentenced for his burglary convictions – 16 months' imprisonment in 2008 and 16 months' imprisonment in 2012.

Defendant does not cite to any cases that would support an argument that a blanket commutation of a felony offense to a misdemeanor offense should receive retroactive application for purposes of calculating one's criminal history score. Indeed, while the government was unable to find any cases directly on point, in analogous situations, courts have declined to give retroactive credit for the commutation of sentences. *See United States v. Alba-Flores*, 577 F.3d 1104, 1108 (9th Cir. 2009) (holding that the fact that a misdemeanor was subsequently reduced to an "infraction nunc pro tunc" does not affect the number of criminal history

3

points assigned to the original conviction); *United States v. Blaeser*, No. 04-1087, 105 Fed. Appx. 130 at *1 (July 29, 2004, 8th Cir) ("Courts must . . . count sentences for convictions that, for reasons unrelated to innocence or errors of law, are set aside or for which the defendant is pardoned").

In any event, defendant's argument ignores the policy reason behind the number of points assigned to a particular prior criminal conviction. A defendant's criminal history category is driven by the amount of time to which defendant was sentenced. That number – the amount of time defendant previously spent in jail – is predictive of defendant's chances of recidivism. If a defendant has never received a sentence of incarceration in his past, there is much hope that a light sentence will deter him from committing further conduct. If, on the other hand, a defendant has served multiple sentences of over a year in length, it is less likely that a sentence at or below that number will deter defendant from future crimes, given that it has been tried and failed. That is the issue here. Defendant has been sentenced multiple times to significant terms of incarceration, but nothing has deterred his continuing criminal activity and there is no indication that another sentence at or below those previous sentences would be any different.

**C.  Substantial Hardship**

Defendant notes that the two-level enhancement for "substantial financial hardship" did not go into effect until November 2015, which was three months after defendant pleaded guilty. Dkt. 143 at 5; U.S.S.G. § 2B1.1(b)(2)(A)(iii). While that is true, the application of the enhancement now is nevertheless appropriate. *United*

4

*States v. Demaree*, 459 F.3d 791, 795 (7th Cir. 2006). *Demaree*'s holding that retroactive application of a guidelines enhancement is not an Ex Post Facto violation is an established circuit precedent, which has been cited approvingly in multiple subsequent opinions authored by the Seventh Circuit. *See, e.g.*, *United States v. Panice*, 598 F.3d 426, 435 (7th Cir. 2010); *United States v. Favara*, 615 F.3d 824, 829 (7th Cir. 2010); *United States v. Nurek*, 578 F.3d 618, 625 (7th Cir. 2009); *United States v. Patterson*, 576 F.3d 431, 444 (7th Cir. 2009). In fact, the Seventh Circuit has begun disposing of this argument through unpublished dispositions. *See, e.g.*, *United States v. Robinson*, 2011 WL 2880699 (7th Cir. July 20, 2011); *United States v. Jones*, 407 Fed. Appx. 974 (7th Cir. 2011); *United States v. Sedrati*, 365 Fed. Appx. 30 (7th Cir. 2010); *United States v. Funchess*, 289 Fed. Appx. 947, 952 (7th Cir. 2008).

In any event, to the extent defendant argues that the retroactive application of the enhancement should be taken into consideration by this Court in mitigation, defendant misses the point. Whether or not the substantial financial hardship enhancement was contemplated by the plea agreement is irrelevant. The fact remains that defendant set out to completely and literally destroy a business. And he succeeded. He thus necessarily (with or without a formal enhancement) should receive a higher sentence than a defendant who sought to obtain $200,000 without

rendering a family out of work and out of a retirement.[1] Defendant cannot now complain about receiving additional punishment when the entire purpose of that crime was to shut the farm down.

### D. Mental Illness

The vast majority of defendant's arguments in mitigation center around his history with mental and physical illness. The government recognizes that the defendant suffers from mental health issues and that those issues likely contribute to the defendant's inability to appropriately channel his strongly-held views regarding the treatment of animals. The government also believes that the Court should take those struggles into account in determining a sentence suitable for defendant.

The government, however, asks this Court to also see the other side of defendant, which is likely a byproduct of defendant's struggles. That side of the defendant is someone who is impulsive, menacing, and quite dangerous. The facts provided to this Court in the government's sentencing memorandum reveals defendant to be someone who is, at times, filled with rage and unable to manage or control it. He is someone who intentionally scares, harasses, and threatens. He is someone who researches the manufacture of destructive weapons and someone who believes in stopping at nothing to advance his cause.

---

[1] Indeed, prior to the application of the enhancement, the government contemplated requesting an above guidelines sentence to factor in the additional devastation caused by defendant's crime that was not adequately reflected in the guidelines range.

Defendant and his family members argue repeatedly that he is a danger only to himself – not to anyone else. But the victims of defendant's crimes are not comforted by that. The individuals who have been terrified while defendant screamed and pounded on their front door are not comforted. The executives and medical researchers who have been the subject of his obsession are not comforted. And the mink farmers, whose sole source of income was decimated in just one night, are not comforted.

To truly argue, as defendant has done, that he is a danger only to himself requires one to ignore the string of victims in defendant's wake. Indeed, the government submits an arrest report to the Court that illustrates the point. *See* Government Exhibit M. While the government is incredibly sympathetic to the motivations of defendant's family members, the report exemplifies the problem – the defendant's inability to control his impulses – and the fact that defendant does pose a danger to society when he is not regulated.

Defendant made a point to minimize one particularly egregious incident described in the PSR, claiming he "never spit on the alleged victim, and the case was dismissed the next day." Dkt. 143 at 5. However, according to a report of an interview with the victim, while the victim did request that charges be dismissed against the defendant, she maintained that she was harassed and spit on in the presence of her four children. *See* Government Exhibit N. The only reason the victim refused to press charges was because she was urged to do so by defendant's family members and was comforted by their assurances, much akin to the

7

assurances now by defendant's family to this Court. *Id.* Again, this incident is illustrative of the larger problem, which is a dangerousness espoused by defendant in the advancement of his cause.

### E. Seriousness of the Offense

Defendant mentions in his memorandum that he "has acknowledged that his commitment to the humane treatment of animals was manifested in a wholly counterproductive and inappropriate way," Dkt. 143 at 2, but apart from that, defendant's memo is silent as to the suffering of the victims in this case. Defendant's memo focuses only on the plight of defendant rather than those who have suffered at his hand. It cannot be forgotten in fashioning a sentence in this case that a lawful business was completely destroyed. A retirement saved has been lost. And many people involved in lawful businesses, particularly in medical research, have been made to feel terrified. The message must be sent to both defendant and the larger community that unlawful activism aimed at instilling fear, stalking, harassing, vandalizing will not be tolerated.

    Respectfully submitted,

    ZACHARY T. FARDON
    United States Attorney

By:   /s/ Bethany K. Biesenthal
    BETHANY K. BIESENTHAL
    WILLIAM RIDGWAY
    Assistant United States Attorneys
    219 South Dearborn Street
    Chicago, Illinois 60604
    (312) 886-7629