UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | |
| vs. | ) | No.   14 CR 390-2 |
| | ) | Honorable Amy J. St. Eve |
| TYLER LANG | ) | |
| | ) | |

## GOVERNMENT'S SENTENCING MEMORANDUM

In August 2013, defendant Tyler Lang vandalized a mink farm. In so doing, he left law-abiding citizens without their sole source of income. Lang's goal was to send a message – stop breeding mink or suffer the consequences. Lang was not engaging in lawful activism or peaceful protest, but instead was committing a crime. As a result, Lang deserves a sentence at the high end of the properly calculated guidelines range of 15 to 21 months' imprisonment, with credit for the time he served in state custody for his Woodford County conviction.

## BACKGROUND

On July 8, 2014, defendant Tyler Lang, together with his co-defendant, Kevin Johnson, was charged by indictment with two counts of damaging an animal enterprise, in violation of Title 18, United States Code, Section 43. R.1. On July 23, 2015, defendant pleaded guilty to Count One of the indictment. R.125. The following sets forth the facts leading to defendant's conviction.

On the night of August 13, 2013, Lang and Johnson vandalized a mink farm located in Morris, Illinois. Lang and Johnson released over 2,000 mink from their cages. Prior to the vandalism, each cage was designated with a card that indicated

from which breed the mink came. During the vandalism, Lang and Johnson removed the cards from the cages and tore some of them into pieces. They spray painted the barn with red paint and the words, "Liberation is Love." Lang and Johnson also damaged two farm trucks by pouring an acidic substance over them. They also damaged the cages and fences surrounding the property.

In an attempt to recoup some of the loss, the farmers, along with assistance from law enforcement, recovered approximately 1,600 of the mink. The remaining mink died or were never recovered. Even for the recovered mink, however, the farmers were harmed in that they were unable to determine the original breed, which is a requirement for re-sale. The damage to the mink, which was the sole livelihood of the farm, together with the physical damage to the vehicles, the barn, and the fence, devastated the farmers, resulting in a loss in excess of $200,000.

On August 14, 2013, the morning after the vandalism, Lang and Johnson were pulled over by a police officer with the Woodford County Sheriff's Office. The area in which Lang and Johnson were pulled over was approximately 90 miles from the mink farm that had been vandalized the night before. When stopped, Lang and Johnson were approximately eight miles from a fox farm and were headed in its direction.

At the time of the traffic stop, Lang was driving the vehicle and Johnson was seated in the passenger seat. However, both Lang and Johnson informed the officer that Johnson was the owner of the vehicle. Both Lang and Johnson informed the officer that they were from the Los Angeles area, which also was confirmed by

2

database queries. Lang and Johnson gave conflicting accounts as to where they had been and where they were going, but both claimed that they were on a road trip visiting various friends.

Ultimately, police officers conducted a full search of the vehicle and recovered the following items that connected Lang and Johnson to the mink farm vandalism:

- A flash drive which contained two known and widely circulated publications amongst animal rights extremists. The authors of the publications advocated the release of minks and foxes from fur farms and also advocated vandalism of the farms. The publications set forth instructions on how to accomplish the release of the animals, including by suggesting the use of new bolt cutters for each act of vandalism, to turn off cellular telephones leading up to and during the act of vandalism, and to obtain police radio scanners to detect law enforcement presence in the area.

- The publications recovered from the vehicle also included lists of mink and fox farms throughout the country. Both the mink farm in Morris, Illinois, and the fox farm in the Central District of Illinois were included in the publications.

- Consistent with the publications, there were multiple cutting tools, bolt cutters, and smaller snips which appeared to be new that were recovered from the vehicle.

- Cell phones were recovered. Analysis of the cell site information from those cell phones revealed that, consistent with the publications' directives, the cell phones were turned off in the days leading up to the mink farm vandalism.

- A radio frequency scanner was recovered. A search of the radio frequency scanner recovered from the vehicle determined that the radio had been set to detect radio frequencies used by law enforcement in both Morris, Illinois, and Woodford County, Illinois. According to online information about the radio scanner, the scanner does not automatically pick up radio traffic in the area. Rather, the scanner must be manually programmed to a particular area in order to receive the radio scans from that area.

- Items consistent with committing a vandalism also were recovered, including, but not limited to, rubber gloves, ski masks, ball caps, bolt cutters, and miscellaneous cutters.[1]

- Animal hair was observed in the vehicle and on items removed from the vehicle.

- A bottle labeled "aircraft paint remover" also was recovered.

A number of the items recovered from the car were sent to FBI labs for further analysis. Based on that analysis, it was determined that some of the animal hair recovered from the clothing and other items found in the car was mink fur. It also was determined that aircraft paint remover was likely the substance that was used to damage the farm vehicles.

## THE ADVISORY GUIDELINE RANGE

The Presentence Investigation Report ("PSR") submitted by the Probation Office, correctly calculated defendant's advisory Guidelines range as follows:

| | | |
|---|---|---|
| 2B1.1(a)(2) | Base offense level: | 6 |
| 2B1.1(b)(1)(F) | Loss Amount: | +10 |
| 3E1.1 | Acceptance | -3 |
| | Total Offense Level | 13 |

PSR at 6-7. The PSR calculates a criminal history category of II. PSR at 9. The resulting Guideline range is 15 to 21 months' imprisonment.

---

[1] These items formed the basis for the possession of burglary tools conviction, for which both Lang and Johnson were convicted in Woodford County, Illinois.

# LANG SHOULD RECEIVE A SENTENCE AT THE HIGH END OF THE RANGE

The 3553(a) factors, namely, the seriousness of the offense, Lang's history and characteristics, the need to protect the public from defendant, and the need to provide adequate deterrence warrant a sentence at the high end of the guidelines range, with credit for the time he served in state custody, resulting from the Woodford County conviction (approximately 170 days).

## A. Seriousness of the Offense, Need to Protect Public, and Need to Provide Adequate Deterrence

The seriousness of the offense, combined with the resulting need to protect the public from defendant and the need to provide adequate deterrence, weigh in favor of a sentence at the high end of guidelines range.

At Johnson's sentencing hearing, the mink farmers provided a statement to the Court in which they described the financial devastation caused by defendant's actions. (The government is in the process of obtaining a transcript of the statement). In sum, the farmers lost their sole source of income and the money they had saved for their retirement. Up until the vandalism, the farmers had engaged in a legal and lawful business that they had worked hard to cultivate. And they had the right to live without harassment and without the threat of harm. Lang's crime was serious because it took away their livelihood and their sense of comfort.

Lang's crime was even more serious because of the way in which it was committed. Lang and Johnson broke onto private property in the middle of the

night, while wearing masks and carrying bolt cutters. The potential for a dangerous chain reaction was very real. Indeed, the whole point of Lang's crime was to instill fear and incite a reaction. The middle-of-the-night intrusion could have been met with resistance or force. And at the very least, it could (and was) met with a resulting anxiety and fear that may never go away.

Finally, Lang's crime is serious because it has a detrimental effect on lawful activism. Freedom of speech and the right to demonstrate are principles upon which this country was founded. Time and again, lawful activism has proven a powerful tool – one that can cure injustice and right wrongs. The use of illegal methods of activism – harassment, threats, vandalism – does nothing more than taint the image of law-abiding activists who are attempting to create change through legal protest and lawful demonstration.

As described below, Lang has been involved in unlawful activism for years. In addition, according to statistics kept by the FBI, animal rights related vandalism, and animal farm vandalism specifically, have been on the upswing in recent years. A within guidelines sentence will not only adequately address the seriousness of the crime, but also protect the public from further illegal activism committed by defendant. It also sends a general deterrence messages that unlawful activism will come at a high price.

**B.     History and Characteristics of the Defendant**

Defendant's history and characteristics further warrant a sentence at the high end of the guidelines range, with credit for the time he served in state custody.

Defendant does not have a serious criminal background, but has been involved in illegal activism for years. That illegal activism has predominantly targeted medical professionals who use animals for medical research. The impact that Lang and others have had on these medical professionals, as described in their own words, is devastating. Three of the medical professionals have provided impact statements, which the government provides to the Court under separate cover. The impact statements are marked as Government Exhibits A and B.

The government contacted two of the medical professionals listed in the impact statements to request specific information concerning Lang's participation in demonstrations outside of their homes. The following summarizes the results of those interviews:

Professor A knows Lang both by name and face. Professor A has been the target of many violent, threatening, and harassing incidents as a result of her use of animals in medical research. The incidents of which she has been a victim range from stalking to criminal damage to property, which are described in more detail in her statement. Professor A reported that she first began seeing Lang at demonstrations outside of her home in approximately 2008. She described the demonstrations in which Lang has been involved as occurring anywhere from once a month to less frequently. She reported seeing Lang at her home no less than 10 times. During those demonstrations, Lang and the others chanted derogatory comments about her race and their desire to see her "burn in hell." She further reported that Lang was arrested outside of her home in May 2011 for demonstrating

less than 100 feet from her home, in violation of California law. One of the times Lang demonstrated outside of Professor A's home, she remembers him videotaping her and her home, "sticking the camera in [her] face over and over again." Other times he was marching and chanting the crude comments. She also has a vivid memory of him being in front of her house at least once in February 2015. Professor A reported that during that incident, she believed that Lang came within 100 feet of her home. She provided the government with photographs of that incident, which show Lang demonstrating alongside a replica of Professor A and in front of her home. The photographs are being provided to the Court under separate cover and are marked as Government Exhibit C. As this Court is aware, Lang has been on pretrial release since his arrest in this case, which pre-dated the February 2015 incident, and was specifically cautioned that as a condition of his pretrial release, he was to refrain from illegal activism.[2]

The government also interviewed Professor B. Professor B stated that he is familiar with Lang's face and name, both by observing Lang at demonstrations outside of his home, as well as from seeing his photograph on social media websites. Professor B stated that he monitors social media pages so that he is aware of upcoming home demonstrations, as well as information and photographs posted after the demonstrations. Like Professor A, Professor B has been the victim of a

---

2   The government does not offer this information as proof of a violation of the law, but instead offers it to illustrate defendant's inability to stay away from the long-term campaign of harassment against Professor A. Indeed, the fact that defendant, while on pretrial release, even came close to the line of engaging in illegal activism, does not bode well for his chances of recidivism.

8

systematic and relentless attack involving the use of home demonstrations. Professor B stated that the demonstrations at his home have occurred for years and take place anywhere from once a month to once every six months. Professor B reported first seeing Lang at the home demonstrations no later than the middle of 2010 and stated that Lang was present for the "majority" of the demonstrations since then. Professor B stated that during the demonstrations, the activists, including Lang, have been in violation of California law requiring that they stay at least 100 feet from the target's home. Professor B has a specific recollection of Lang encroaching on Professor B's driveway and attempting to block it. During the demonstrations, Professor B stated that the demonstrators chant things such as "burn in hell." The demonstrations lasted anywhere from a half hour to three and a half hours. Professor B has observed Lang chanting and often has seen him as the chant leader. Professor B has a specific recollection of seeing Lang at demonstrations no less than twice in 2014.

Lang also has been the subject of more than one order of protection and/or restraining order as a result of his activism. Indeed, at least two large corporations have obtained injunctions, preventing Lang from harassing the corporations' employees. The injunctions are provided to the Court under separate cover and are marked as Government Exhibits D and E.

In sum, Lang has a history of going over the line with his activism. He does not stop with lawful demonstration, but instead, harasses and instills fear. This behavior appears to have continued up until to the time he is on pretrial release with

9

this Court. Defendant's history and characteristics therefore also warrant a sentence at the high end of the guidelines range.

## CONDITIONS OF SUPERVISED RELEASE

The government has no objection to the conditions of supervised release proposed in the PSR and believes that each of those proposed conditions is necessary to effectively supervise Lang and monitor his whereabouts while on supervised release. In addition, the conditions will assist the probation officer in assessing whether Lang is in compliance with his conditions of supervised release, as well as ensure that he is working toward active employment and a productive life after his term of incarceration.

## CONCLUSION

For the reasons set forth above, the government respectfully requests this Court sentence defendant to a sentence at the high end of the guidelines range, with credit for the time he served in state custody, resulting from the Woodford County conviction.

    Respectfully submitted,

    ZACHARY T. FARDON
    United States Attorney

By:    /s/ Bethany K. Biesenthal
    BETHANY K. BIESENTHAL
    WILLIAM RIDGWAY
    Assistant United States Attorneys
    219 South Dearborn Street
    Chicago, Illinois 60604
    (312) 886-7629